ROY ROBERTS v. STATE OF NEBRASKA.

FILED JULY 1, 1916.   No. 19199.

1. **Criminal Law:** PUBLIC TRIAL. The statute requires criminal trials
to be held in the court-room provided by the county board. Rev.
St. 1913, sec. 1162. The law requires that trials be public, but this
requirement is satisfied by admitting those who could conveniently
be accommodated in the court-room where the law requires such
trials to be held, without interrupting the calm and orderly course
of justice.

2. ————: PLACE OF TRIAL. It is not proper to adjourn a criminal
trial for a capital offense from the regular court-room to the stage
of a public theater, without sufficient cause for so doing, the theater
itself being filled with people, and under some circumstances may
be so prejudicial to defendant as to require a reversal.

3. ————: SEPARATION OF WITNESSES. The separation of the witnesses
in a criminal trial is ordinarily a matter within the discretion of
the trial court, but when requested, especially in a trial for felony,
it is seldom denied. When the witnesses for the prosecution are
near relatives, or are or have been recently so associated that it is
not improbable that some of them may be under the influence of
another witness who is interested in the prosecution, it is erroneous
to allow such witnesses to be present and hear each other's testi-
mony, against the objection of the defendant.

4. ————: ATTORNEY AS WITNESS. It is improper to allow one who
testifies as a witness to the principal facts in the case to also as
attorney conduct the trial in the examination of witnesses and ar-
gument to the jury. But the judgment will not necessarily be re-
versed because an attorney at law, who is a witness in the case, is
allowed to assist the prosecuting attorney in the preparation and
in the details of the trial.

5. **Witnesses: Competency of Infant.** When a child seven years of age is offered as a witness, it is the duty of the court to examine her, alone if necessary, as to her competency, and the sound judicial discretion of the court in allowing or refusing to allow her to relate to the jury the facts within her knowledge will not ordinarily be interfered with by this court. It is erroneous to take the unsworn statements of an interested party as to the qualifications of such witness and exclude her testimony without examination by the court.

6. **Criminal Law: Misconduct of Jury.** In a trial for felony, if the bailiff in charge of the jury, with the help of some of the jurors and without the order of the court, removes a quantity of miscellaneous articles, of which some as exhibits have been received in evidence, and some have not, from the court-room to the jury-room, and such articles are there examined and considered by the jury in arriving at their verdict, such conduct will vitiate the verdict, and a new trial should be awarded.

Errors to the district court for Lincoln county: Hanson M. Grimes, Judge. *Reversed.*

*James T. Keefe,* for plaintiff in error.

*Willis E. Reed, Attorney General, Charles S. Roe* and *George N. Gibbs, contra.*

Sedgwick, J.,

Defendant was convicted in the district court for Lincoln county of murder in the first degree. The jury fixed the penalty at death, and he prosecuted error to this court. He is charged with having killed Vernon Connett on August 2, 1914. Connett was a young farmer whose home was at Bird City, Kansas. Mrs. Connett had not been in robust health, and her physician advised that she live in the open air. Accordingly the Connett family left their home in Kansas and drove across the country, living in a covered wagon, and intending to visit some relatives in this state. They arrived at North Platte July 31, 1914, where, by chance, they met defendant. A friendship appears to have rapidly developed between the two men. Defendant's mother and her husband, Charles Clayton, were employees on a ranch

situated about five miles northwest of the city of North
Platte. Defendant, together with Connett and his wife
and baby, drove to this ranch, arriving about 5 o'clock
in the evening. They camped there for the night, and the
next day Connett determined to seek work in the neigh-
borhood and to send his wife and baby to their people
by rail. Defendant and the Connett family drove to
the city of North Platte, where Mrs. Connett and the
baby took the train for Mason City. Defendant and
Connett then returned to the ranch. They remained
there that night and until some time the following after-
noon. So far there seems ˜to be no conflict in the
evidence. Connett was killed, and this defendant dis-
posed of Connett's property, and did other things and
conducted himself generally so as to leave no doubt that
he had a part in the tragedy that resulted in the death
of Connett. Defendant was about 22 years of age at
the time of the alleged crime. He had been convicted of
robbery and sentenced to an indeterminate term in the
penitentiary, but prior to the date charged in the in-
formation, had been released from the penitentiary on
parole. Clayton was also a paroled convict, and the
defendant's mother had been living with Clayton for
several years as his wife. Clayton and his wife were at
first arrested for the crime, but, so far as the record
shows, they were not prosecuted. The questions to be
tried were whether the crime committed was premeditated
murder to obtain the property that Connett had with
him and calling for the death penalty, or whether the
killing was done in a quarrel and the appropriation of
Connett's property was an after-thought so that the
crime was of a less degree. Was the crime committed
by this defendant alone, or was the fatal blow struck
by Clayton, making him the principal and his wife and
the defendant accessories thereto? According to the
testimony for the state, defendant and Connett drove
away from this ranch about 4 o'clock Sunday afternoon,
saying that they were going to the neighborhood of

Hershey, where they expected to find work, and Connett was never again seen alive.

The evidence, if true, would relieve Mr. and Mrs. Clayton from suspicion. The defendant's testimony was that while they were at the ranch an altercation arose between himself and Connett which resulted in Connett's knocking defendant down, and while Connett was continuing his attack and was leaning over defendant attempting to choke him, upon defendant's cries for help, Clayton rushed to the scene and struck Connett several blows upon the head which caused his death. He says that Clayton first removed the body, and afterwards he and Clayton planned the disposition of the body and the property of Connett. Defendant disposed of the property, and says that he divided the proceeds with Clayton. He is to some extent corroborated in this. It is shown that he received gold coin for some of Connett's property. Clayton testified that he did not receive any of the property or the proceeds thereof, and also testified that he had not had any gold coin from any source. There was some evidence that soon after Connett's disappearance Clayton paid a $5 gold coin for liquor at a saloon.

When such a crime as this is committed, so dangerous to the safety of society, it is of the highest importance to ascertain the truth of the case, to establish the real character of the crime, and fix the responsibility upon the guilty party. Unfortunately for the interests of humanity it is not always possible to do this. The greatest criminal is often able to divert attention from himself, and to turn the vengeance of the public against one who may not be free from guilt, but who is less guilty than himself. It too often happens that the one least guilty, or perhaps even entirely innocent of the crime, is made to bear the punishment therefor, and so satisfy the sense of justice of the community, too readily convinced in the eager and laudable desire to see the crime properly punished. For these reasons, the

Roberts v. State.

Constitution and laws have provided certain regulations for the trial of persons charged with crime intended to prevent the terrible mistake of allowing the guilty to escape punishment through a mistaken belief on the part of the public and the authorities that justice had been done.    According to the defendant's testimony, there were four living witnesses to the crime besides the defendant himself, Mr. Clayton, his wife, Mrs. Clayton's. little girl, and a boy about 17 years old named Jones. Clayton and the boy testified to the essential facts relied upon as fastening the guilt upon the defendant. Mrs. Clayton was called only in rebuttal to explain an incident which it was claimed indicated her participation in the crime.    The little girl was offered as a witness by the defendant, but was excluded by the court.    And so we do not have the evidence of either Mrs. Clayton or the little girl, both of whom were present and witnessed the crime, according to the defendant's version.

The court removed the trial from the court-room to the theater, and stated as a reason therefor: "By reason of the insufficiency of the court-room to seat and accommodate the people applying for admission, and also by reason of there being some question as to the safety of the building crowded to its full capacity as it is, it is by the court ordered that the further trial of this cause be had at the Keith Theater, and thereupon the court was adjourned to Keith Theater, where trial proceeded." The stage was occupied by court, counsel, jury, witnesses, and officers connected with the trial. The theater proper was crowded with curious spectators. Before the trial was completed it was returned to the court-room and concluded there.    At the adjournment of court on one occasion the bailiff announced from the stage: "The regular show will be tomorrow; matinee in the afternoon and another performance at 8:30. Court is now adjourned until 7:30." The court manifested no disapproval of this announcement. The defendant now insists that such proceedings were pre-

judicial to the calm consideration of his cause to which he was entitled.

The law requires that trials shall be public, but this requirement is satisfied by admitting those who could conveniently be accommodated in the court-room where the law requires such trials to be held (Rev. St. 1913, sec. 1162), without interrupting the calm and orderly course of justice. This young man was already a convict. Did the jury infer from these, and other similar transactions, that it was immaterial in what manner the defendant was tried; that it was not necessary to take great pains in weighing the evidence against a convict who by his own admissions had violated the law? It is not clear that the defendant was not prejudiced by these proceedings.

The defendant demanded that the state's witnesses be separated so as not to hear each other's testimony. In some jurisdictions this is a matter of right. 1 Greenleaf, Evidence (16th ed.) sec. 432, says: "This order, upon the motion or suggestions of either party, is rarely withheld." *Binfield v. State,* 15 Neb. 484. In our state it has been considered to rest in the discretion of the trial court. This court has said that the practice of so separating the witnesses "is a good one, as it tends to elicit the truth and promote the ends of justice." *Chicago, B. & Q. R. Co. v. Kellogg,* 54 Neb. 138, 141. So far as we now recollect, the court has never suggested what would amount to an abuse of discretion in that regard. To have separated these witnesses would seem to have been peculiarly appropriate in this case. It was urged that the witness Johnny Jones was of weak mind and under the influence and control of Clayton, with whom he worked. Clayton testified to a condition which would relieve himself of all guilt and place the awful responsibility for this crime upon the young man. The boy Jones reiterates the story of Clayton in all its details, and so the evidence of Roberts is overborne, and it is supposed to be established beyond a reason-

able doubt that Roberts is alone responsible for the death of Connett. Such conditions call for the separate examination of the witnesses, and this court has never held that it is not an abuse of discretion to deny the request under such conditions. The reason given by the court for refusing to separate the witnesses was stated upon the record: "The temperature ranging about zero, and by reason of the fact that there is no place where witnesses can be kept, for the want of proper and suitable conveniences, the application is denied." There were no conveniences at the theater to enable the court to conduct the trial in the regular and ordinary manner. The rights of the defendant were prejudiced, and this was made necessary principally because of the unauthorized removal of the trial from the court-room.

Edward G. Maggi, of the state board of pardons, who is also a member of the bar, was appointed by the court to assist the county attorney in the prosecution. Mr. Maggi was active in obtaining evidence and was an important witness in the case. Ordinarily it is not expected that the attorney in the case will be also a principal witness. Trial lawyers of experience hesitate to act as witnesses and active counsel in the trial unless under unusual circumstances it becomes necessary to identify some writing or supply some formal proof of a matter peculiarly within the knowledge of counsel as such. To discuss in argument the reliability and weight of one's own evidence is embarrassing to counsel, and sometimes confusing to jurors. In this case, however, the part taken by Mr. Maggi in the trial does not seem to have been inconsistent with his position as a witness or his interest as an officer of the state.

The little girl offered by the defendant as a witness was a little less than seven years of age. The defendant asserts that if she were allowed to testify her evidence would satisfy the jury that Clayton and his wife, who were first arrested for the crime, were the prin-

cipal criminals; that they directed him in disposing of Connett's property and shared in the proceeds. The court, without himself examining the little girl, left it substantially to Mrs. Clayton to determine whether she be allowed to testify, and it is urged that Mrs. Clayton, not being under oath, and having reasons to fear that the evidence offered would convict her of crime, advised that the girl was not competent. The judge then informed the jury:

"Gentlemen, this is a child. She has not reached the age of seven years. She has not gone to school to exceed three months. We all know that at that immature age children get ideas from suggestion. To the court's mind it would be cruelty to attempt to force a child of that immature age; she doesn't know or understand any of the obligations of the oath, and therefore the court will not permit her to be put upon the stand, because of her immature age and because of her inability to understand and know the obligation of an oath. The child is of that immature age that as soon as the suggestion is made that she come upon the stand, even though accompanied by her mother, she breaks down and cries through fear, and this takes place in the court's presence and hearing."

A little child is generally supposed to be likely to tell the truth, and the trial court will not usually reject her evidence without first examining her as to her intelligence and understanding. To examine another person who may have the strongest motive to prevent the child from telling the jury just what took place, and to exclude the child's evidence because of the say-so of the interested person so examined, is not the usual practice. It is not strange that the child was frightened. She was perhaps not accustomed to taking part in a state performance before a theater full of curious and excited people. If she had been encouraged by the court in the quiet and order of the usual trial court-room, separate and apart from the other witnesses, and free from

Roberts v. State.

fear of those interested parties who for their own pro-
tection may have tried to overawe her in advance,
she might possibly have convinced the court that she
had a clear remembrance of the whole transaction in
question, and that she could relate it in such a way as
to greatly assist the jury.

After the case had been submitted to the jury, and
in the absence of the judge, and without his order or
knowledge, the bailiff permitted some of the jurors
to leave the jury-room, and go to the court-room, and
there, with the help of the bailiff, they gathered ex-
hibits including as it is alleged, "a certain skull, a
jaw-bone, the partial skeleton of a hand or some fin-
gers, several shirts, a hat, cap, two or three pairs of
trousers, a pair of shoes, belt, a post card one photo-
graph of the alleged place where the alleged body was
supposed to have been found, one white dress and a
skirt belonging to Mrs. Clayton,   *   *   *   one bed
comforter, together with some alleged human hair, and
a suit case, and a photograph purporting to be a fam-
ily photograph of the Connett family," of which some
had been received in evidence, and some had not, and
took them to the jury-room, and there discussed the
bearing of these promiscuous articles upon the prob-
ability of guilt of the defendant. This transaction re-
quires no discussion. It is universally held that such
misconduct requires a reversal.

It is also complained that a juror had before the
trial stated his positive opinions as to the guilt of de-
fendant, but denied upon his *voir dire* examination that
he had formed or expressed any such opinion; that one
of the jurors in the jury-room stated important mat-
ters as facts, and drew a "map" of the locality of the
crime, which showed different measurements and dis-
tances than those testified to by the witnesses, and
otherwise misled his fellow jurors; that the bailiff
talked with the jurors while they were considering their
verdict. But these, and some other matters complained

of, will not be likely to affect another trial, and it seems unnecessary to discuss them at length. The defendant has been unfortunate in his home life, or rather in his lack of a home, and in his vicious surroundings. His mother was living with Clayton, a convict of mature years, as his wife. If defendant is not guilty as charged, this man Clayton was the cause of Connett's death. It is of the highest importance to determine, if possible, the truth of the matter. At all events, in view of the manifold errors indicated, this court cannot say that there has been a trial as the law requires, and the judgment is reversed and the cause remanded for further proceedings.

REVERSED.

ROSE, J. I concur in the reversal of the conviction on two grounds: (1) There was prejudicial error in the transferring of the place of trial from the court-house to the opera house and in the resulting conduct at the latter place. (2) Failure of the trial court to interrogate the child offered as a witness on behalf of defendant and the order preventing her from testifying without a proper inquiry into her capacity to testify require a new trial.

MORRISSEY, C. J., dissenting.

According to the testimony for the state, defendant and Connett drove away from the ranch about 4 o'clock Sunday afternoon, saying that they were going to the neighborhood of Hershey, where they expected to find work. The following morning defendant drove Connett's team and wagon to a livery stable in Hershey. He there sold the team and wagon for $250, executed a bill of sale therefor, and signed thereto the name "Vernon Connett." He received in payment a check made payable to "Vernon Connett." He wrote the name "Vernon Connett" thereon and cashed the check at a local bank. He then went to the post office and

wrote a postal card, directed to "Mrs. Connett, Mason City, Neb." On this card he wrote: "Dear girl. Glad you are all right. Roy went to South Dakota. I am going to do some hauling. Don't write for 3 or 4 days, I won't be in town. V. C." He mailed this card to Mrs. Connett. Taking the trunks and personal baggage belonging to Connett that were in the wagon, he hired a conveyance which conveyed him and this baggage to North Platte. He there took a train to Lincoln, called on the secretary of the state prison board, made his monthly report as was required under his parole, then went to the penitentiary and reported to the warden, and after staying around the city of Lincoln a day or two returned again to the ranch where his mother was living, paid a short visit to the family and again departed. Soon thereafter a search was instituted for Connett; the postal card which defendant had mailed was discovered to be a forgery, the team was located, and it was generally understood that Connett had met with foul play. Defendant's parole was revoked and he was again placed in the penitentiary. His mother and stepfather were arrested, but, so far as the record discloses, no formal complaints were filed against them. They told a number of conflicting stories, but finally gave information which led to the discovery of Connett's body in the bed of the Platte river near the town of Hershey, in Lincoln county, January 13, 1915. Decomposition had progressed to such a degree that the body could not be identified by the features, but it was identified beyond question by the clothing, teeth, and other marks. Three puncture fractures were found in the skull, one in the frontal bone and one on either side, and the testimony shows that any of these might prove fatal. There is no direct proof as to how these fractures were produced, nor by what hand the blows were struck. The case, so far as the state is concerned, rests on the testimony of Charles Clayton, the stepfather, and Johnny Jones, a 17-year-old boy

100  Neb.—14

who worked on the ranch, corroborated by the conduct of defendant and supported by his conflicting stories. Clayton and Jones testify that defendant and Connett left the ranch together on Sunday evening, August 2, the evening before defendant sold Connett's team in the town of Hershey.

The defendant, testifying in his own behalf, admitted meeting Connett and family in North Platte, and all the incidents as shown by the state down to Sunday afternoon. His story as given on the trial is that during the afternoon he and Connett engaged in a quarrel; that Connett knocked him down and was in the act of choking him when he called for help; that his stepfather, Clayton, rushed out with a hammer, struck Connett on the head, felled him to the ground, and then struck him two or three blows with the hammer, and that Connett instantly died. He then says that Clayton, Mrs. Clayton, defendant's mother, and defendant carried the body 75 or 100 yards and hid it in a clump of weeds; that later they carried the body back again, put it in a wagon, and that he drove away with this body, with directions from Clayton to hide it so as to conceal the crime, and to then proceed to Hershey and sell the team and wagon; that, pursuant to these instructions from Clayton, he took the body to the point where it was later found in the river bed; made the sale of the team, wrote the postal card, and went to North Platte, where he divided the proceeds of the team with Clayton.

This entire story is denied by Clayton. It is also denied by Jones. Jones is referred to by counsel for defendant as an idiot, and it is strenuously insisted that his testimony is not worthy of belief. Although 17 years of age, he had never advanced beyond the fourth grade in school, and he seems to be subnormal mentally. Nevertheless he tells a straightforward and convincing story. He was cross-examined at length without his testimony being shaken in the least, and

there is nothing to indicate that he had any disposition to depart from the truth.

A number of assignments are directed to the admission of exhibits. These exhibits relate to matters which the defendant later admitted in his own testimony. This was properly a part of the state's case, and their admission could not have been prejudicial.

During the trial the court, on its own motion, made the following finding: "By reason of the insufficiency of the court-room to seat and accommodate the people applying for admission, and also by reason of there being some question as to the safety of the building crowded to its full capacity as it is, it is by the court ordered that the further trial of this cause be had at the Keith Theater, and thereupon the court was adjourned to Keith Theater, where the trial proceeded"—and transferred the trial from the Lincoln county courthouse to the Keith Theater in the city of North Platte. There the court, attorneys, witnesses, and jury were seated on the stage, and the body of the house was filled with spectators. Defendant's counsel objected to the transfer of the trial, and also objected to the seating of the witnesses for the state on the stage, and asked that they be excluded from the room during the trial. His objections and motion were overruled; the court saying that there were no adequate accommodations for the witnesses elsewhere.

During the progress of the trial the court bailiff made the following announcement from the stage of the theater as court was about to take a recess: "The regular show will be tomorrow; matinee in the afternoon and another performance at 8:30. Court is now adjourned until 7:30." This announcement of a show did not refer to the trial, but to an exhibition to be given by a troupe of professional actors, and it seems to be conceded that the arrival of this show troupe necessitated the surrender of the theater, and that thereafter the trial was conducted in the courthouse.

The administration of justice ought not to be confused or confounded with shows and entertainments. The trial ought to have been conducted in the courthouse with the decorum becoming a judicial investigation where a defendant is on trial for his life. However, after carefully reading all of the testimony, I find the evidence of defendant's guilt so strong that I cannot concur in an opinion that sets aside the verdict of the jury merely because the court, in this respect, turned aside from the beaten path of judicial procedure.

In addition to the witnesses who testified for the state, there were present at the ranch on that Sunday afternoon defendant's mother and his half-sister, Nellie Roberts, a child then just past six years of age. Defendant's mother was not called as a witness by either side as to what occurred at the ranch, but defendant asked to have the little girl called as a witness. Thereupon the court interrogated the little girl's mother, but without putting her under oath, and elicited the information that the child had gone to school two or three months, and that she had attended Sunday school "part of the time," and then, turning to the jury, the court said: "Gentlemen, this is a child. She has not reached the age of seven years. She has not gone to school to exceed three months. We all know that at that immature age children get ideas from suggestion. To the court's mind it would be cruelty to attempt to force a child of that immature age; she doesn't know or understand any of the obligations of the oath, and therefore the court will not permit her to be put upon the stand, because of her immature age and because of her inability to understand and know the obligation of an oath. The child is of that immature age that as soon as the suggestion is made that she come upon the stand, even though accompanied by her mother, she breaks down and cries through fear, and this takes place in the court's presence and hearing."

Thereupon counsel for defendant offered to call witnesses and have them examined relative to the competency of the child, but the offer was denied.    He then offered to prove by the child that a fight occurred at the ranch substantially as detailed by the defendant.    This offer was also denied, and the ruling of the court is assigned as error.

"No fixed rule can be laid down as to the age a child must be to entitle it to testify as a witness in a court of justice.    The question of competency of a person to be a witness must be left to the sound legal discretion of the trial judge, leaving to the jury to determine the credit that ought to be given to the testimony."    *Davis v. State,* 31 Neb. 247, 255.

The court has made a specific finding as to the appearance and conduct of the child, and in the exercise of that sound legal discretion which is vested in the trial judge has excluded the testimony.    The mother of the child was present and might have been called to prove the same matters sought to be proved by the child.    It nowhere appears that she was unfriendly to the defendant, nor is any reason given for not calling her.    It was suggested in argument that she might conceal the truth in order to protect her husband, but we can hardly indulge the belief that this woman, who was then living with her third husband, would conceal the truth to protect the husband, when its concealment might send her son to the electric chair.

Of the court's refusal to exclude the witnesses from the stage of the theater, it may be said that the instant case is peculiar in that the major portion of the testimony is undisputed.    The usual danger of a witness being influenced by the testimony of another witness where he is permitted to remain in the courtroom and hear the examination was not present, and under the circumstances the court was not

guilty of such an abuse of discretion in this regard as calls for a reversal of the judgment.

After the jury had been instructed and retired to the jury-room, they called upon the bailiff for exhibits that had been offered in evidence. The bailiff then permitted a number of jurors to go into the court-room proper, where the exhibits had been left, and he, together with these jurors, gathered up the exhibits and carried them to the jury-room. Among these exhibits was deceased's skull, and a shirt which was found on the body when it was discovered. In support of a motion for a new trial, defendant set out an affidavit of a juror, in which it was alleged that the jurors, after having procured these exhibits, attempted to fit the shirt over the skull, and so arranged it as to bring a hole in the shirt over a hole or fracture in the skull, and that from their experiments with these exhibits they reached the conclusion that, as deceased was disrobing and had his shirt pulled over his head, he was struck and killed by the defendant, thus disproving his story of the fight at the ranch. The exhibits had been offered and received in evidence. The defendant by his own story had sufficiently identified them. The skull is shown to have been found in the river bed where defendant testified he put the body of deceased. The marks it bore were such as corresponded to his theory of the killing, and the issues had been narrowed down to the point where the jury were left with practically nothing to determine but the time, place, and person who did the killing, was it at the ranch in the afternoon, and were the blows struck by Charles Clayton, or was it some time during the succeeding night, and were the blows struck by the defendant. An examination of the exhibits could not work to his prejudice.

When we consider the numerous conflicting stories told by the defendant, stories which he now admits

to be untrue, together with his disposition of the deceased's property, the writing of the postal card to the widow, and the unreasonableness of the story he told at the trial, it seems to the writer that his guilt was fully proved. A heinous crime has been committed; all the facts and circumstances bearing on its commission have been submitted to a jury; defendant was represented by able and zealous counsel; a verdict in harmony with the evidence has been returned; a judgment that fits the crime has been pronounced; and that judgment ought not to be set aside for technical errors that do not affect the substantial rights of the defendant.

BARNES, J.   I concur in this dissent.

HAMER, J., dissenting.

The witness Johnny Jones testified that on Sunday the defendant, Roy Roberts, and the deceased, Vernon Connett, hitched up the team and drove away together. That was the last time that Johnny Jones saw Connett. A peculiar thing about Connett and the defendant going away together is, that the defendant just before they went kissed his mother and little sister good-bye. It looks as if this starting away together was the beginning of the journey of the deceased to his grave.   Mrs. Connett appears to have sufficiently identified the body of her husband, who was buried not far from Sutherland, by his clothing and his teeth.   The clothing was also identified by R. H. Connett, the brother of the deceased. The defendant appears to have succeeded in getting the deceased to go to the Sund ranch with him.   His stepfather and his mother and little sister resided there.

On the 3rd day of August the defendant appears to have executed a bill of sale for the team, harness and wagon.   He signed the name "Vernon Connett" to the bill of sale.   The bill of sale is made to one W. H. Jenkins.   Oliver H. Ireley, a banker residing at Hershey,

Nebraska, made out the bill of sale, and he identified the defendant as the man who signed it. The consideration was $250. This witness testified that he saw the instrument delivered to the defendant, who was then claiming to be Vernon Connett. The defendant was recognized by Mr. Ireley. Jenkins paid for the team and wagon with a check on the Bank of Lincoln County. The check was presented to the bank by the defendant claiming to be Vernon Connett, and was cashed by the bank; the defendant receiving the money. The payment was in gold. The horses, wagon and harness all belonged to the deceased. The defendant testified to being sentenced to the penitentiary for 15 years. The trial was at Grand Island. He was paroled. He also testified that his sister is in the reform school. The stepfather appears to be a convict paroled from the Nebraska penitentiary.

On Friday morning at North Platte the defendant first met the deceased, and visited him so industriously that by 2 o'clock in the afternoon they started for the Sund place. There were in the wagon the deceased, Connett, and his wife and baby, and also the defendant. Sund's place is described as about four or five miles northwest of North Platte. On their way out there a burr dropped off the axle of the wagon. They were unable to find it. With more or less trouble, because the wheel would not stay on, they finally succeeded in driving to the Sund place. That evening the defendant visited with his mother and little sister, but the deceased's wife cooked supper by a fire that was built near the wagon, and the defendant ate supper with the Connetts. That night the defendant's mother loaned him some bed clothes and he made a bed on the ground not far from Connett's wagon. In the morning the defendant visited with his stepfather a short time, and then spoke to his mother and little sister, but after that he went back to the wagon, and when the Connetts got breakfast ready he ate with them. Defendant stayed continuously with Connett. Mrs. Connett borrowed a wash-boiler and wash-board of the de-

fendant's mother.  She then did her washing at the southwest corner of the house.  The defendant borrowed his stepfather's razor and made some lather and shaved Connett.  They appear to have had a good dinner together, because two chickens were killed and cooked, and there were noodles.  Then they hooked the team up to one of Mr. Sund's wagons and took Mrs. Connett to the Union Pacific depot in North Platte.  It was from there that she started to Mason City.  This then left the defendant alone with Connett, so that nobody might disturb him.  For the last time Mr. Connett kissed his wife and baby good-bye.  Then he and the defendant started for Sund's place.  Arriving there, they unhitched the horses and went into the house.  The defendant went with Connett and helped him to take the blankets out of his wagon and to hang them up so that they might dry.  Then they had a lunch together by themselves— just these two.  The defendant appears in the evening to have entertained Connett by acting the part of a ghost and scaring young Jones, who had gone into the corn-field to wait until the snipes would drop into the bag which he held.  This sort of performance enabled the defendant to divert and amuse Connett.  The defendant and Connett slept in Connett's wagon that night.  In the morning the defendant and Connett both ate breakfast with the defendant's mother.  Their clothes had been drawn out of shape by the rain of the day previous, and the defendant borrowed a flat-iron of his mother.  He pressed a pair of pants for Connett, and also a pair for Clayton, and one pair for himself.  The defendant testified that while they were there Mr. Harding came, and that they all conversed with him as to whether he knew where Connett could find employment such as working in the hay-field with the team.  From and including this testimony it is well to inquire how many of the alleged facts were manufactured by the defendant for himself for his own personal benefit.  But defendant testified: "We were speaking of people in general, that is, fellows

that we had associated with, and as to their character and different things of that sort, and it seems as though Clayton wanted to leave the impression with Harding that he was quite a rounder. He said several things in regard to his ability as a bad man; even spoke of riding bad horses in Cheyenne, Wyoming, and at one time there a man cut the 'let-go,' I believe he called it, of his saddle, and after cutting the let-go of his saddle, which he claimed at that time would have meant that he would have won the championship, if it hadn't been cut, of the frontier day at that time, he claimed, that after the let-go broke he was carrying, I believe, a 45 Colt's revolver, which, after the let-go broke and threw him, he immediately pulled out." This is apparently the beginning of the defendant's plan of presenting Clayton as a violent and vicious sort of man. After Harding went away Clayton, Connett and the defendant went back to Connett's wagon, so defendant testified, and they sang some songs. After that they went into the house and had dinner. The defendant testified that after dinner was over he and Clayton got into an argument in regard to the defendant's mother, and that Clayton said that if the defendant's mother ever left him, or did him as she had others, he would shoot her. Then the defendant says that he told Clayton that if he (Clayton) did anything of that kind he "would have to shoot me on sight, and he said something about he didn't think that would be hard to do; and I don't remember just exactly what I said, but I said something to the effect that I had a notion to hit him then, and I think I called him a name, I am not just exactly positive, and Mr. Connett stepped up and said, 'If there is any fighting to be done here, I will do it.'" The defendant further testified that he turned around to Connett and said to him, "What are you butting in for?" and that Connett then said he thought he had a right to butt in; and the defendant then testified that he said to Connett, "You ——, I'll hit you in the nose."

This story up to this point is unnatural and improbable in the extreme.  Connett, according to the story, had been invited into the house with the defendant, and they had eaten their breakfast and dinner together in the house.  There had been no sort of controversy.  Besides, if the deceased, Connett, was friendly to the defendant, as he appears to have been, and very much dominated by him, which seems to have been the fact, he would not have wanted to do anything contrary to the will of the defendant.  But the defendant goes right along with his improbable story: "Just about that time Connett knocked me down, and after knocking me down he put his left knee in my stomach and both hands around my neck, and while down there I told him that I had enough, that I didn't want to fight."  Let us analyze that.  Why should Connett have been attacked when there was no reason whatever for attacking him?  And as Connett does not appear to have been struck in the nose, did he have any reason to knock the defendant down?  It is unnatural that he should have done so until he was actually struck.  The statement that he put his left knee on his stomach and that he put both hands around his neck is an improbable story.  Defendant had the deceased put himself in an uncomfortable and untenable attitude.  Men do not fight by putting their knees in each other's stomachs and then putting their hands around the neck.  It cannot be done.  It is true that he could have put his knee in his stomach, but he could not have put his knee in his stomach and choked him at the same time.  He might have choked him at one time, and put his knee in his stomach at another time, but never could he take the position described by the defendant.  This part of the story was invented for the express purpose of reducing the degree of the offense charged.  That fact is still further apparent by what happens, according to the defendant: "And while down there I told him that I had had enough, that I didn't want to fight.  He wouldn't quit choking me."  This is an unnatu-

Roberts v. State.

ral thing that he would not quit choking the defendant
after the defendant told him that he had had enough, and
that he did not want to fight.   Men do not choke one
another under those circumstances.   But the last part of
this unnatural story puts on it the climax of its improba-
bility.   The defendant puts himself in the position of
one calling for help, and then Clayton, instead of in-
terfering as men do interfere by taking hold of Connett
with his hands and pulling him off, is represented as
picking up a hammer and running over and  pounding
Connett on the head with it until he is dead.   That is
the worst part of this piece of fiction.   He testified: "Mr.
Clayton was standing right near the milk-house, and he
picked up a hammer and ran over to where Mr. Connett
was, and he hit him in the head with this hammer, and
after he fell down he hit him two or three more times."
Assuming that Clayton is like other men, it is fair to
presume that, if there had. really been a fight and that he
had seen it, he would have run over and would have
taken hold of the contestant who had the best of it. In-
stead of doing that, according to his story, he pounded
him in the head with a hammer, and, to make sure that
he was good and dead, he hit him two or three times
after he was down.   Assuming that Clayton was a nat-
ural man, he would have been appalled at once when he
struck Connett with the hammer and Connett fell down,
and he would have been doing everything that he could
to revive him.   Then the defendant was himself perfectly
helpless.   He says that Clayton came over to where
he was, "and my legs were under the body of Vernon
Connett, and he pulled me out by the shoulders.   Oh,
possibly three feet he moved me, after getting me out
from under Mr. Connett's body, and after that I began
to sit up, and Clayton says, 'What will I do?' "   In the
mind of the author of this piece of unreal literature the
defendant was to be shown to be utterly helpless, and the
big body of a man of ordinary size was lying upon him,
and he had to be pulled out from under the body. But

that is not all.  Right here this piece of literature pro-
ceeds to put the blame of killing the man all on Clay-
ton, and Clayton . begins to wonder what he is going
to do, and he asks the defendant.  He says Clayton rolled
the body of the dead man over onto the blanket, and then
said, "Take hold of the bottom end of that," and then
they carried the body 75 or 100 yards east of Mr. Sund's
house and put it into a pile of weeds.  Then he draws a
picture of his little sister standing near the corner, that
she had a little bob-tailed dog with her, and that he took
hold of her hand and led her into the house, and then
the mother inquired, "What has Charlie done?" where-
upon the defendant told her that Charlie had "killed
that man." He then tells that Clayton called to him
from the barn, and that he went to the barn, and that
Clayton began to ask him what he was going to do, and
that Clayton said to him, "You are going to help me,
ain't you?" and that Clayton also said, "It is possible
that I will have you sent back to Lincoln on your parole,
and maybe a murder charge put against you; maybe I
will do otherwise." He says that Clayton threatened
him if he did not help him, and then that he finally said
"All right." Then they led the team out of the barn and
hooked them onto the wagon and took the endgate out,
and then that his mother joined them at the corner of
the house and from there they walked to where the body
of the man was in the weeds, and "mother and Clayton
took hold of the head end of the man and I took hold
of the foot end of the man, and we carried him back
to the wagon, and after carrying him back to the wagon
we laid him down." It seems that they then put him
in the wagon, according to the story, and that they
had the blanket or skirt, or whatever it was, wrapped
around his shoulders and head, and then he says that
Clayton gave him certain directions; that Clayton told
him: "After you lay this man out and bury him, or
wherever you want to put him go to Hershey, Nebraska,
and there sell the team if you can.  After selling the

team I will meet you in North Platte." He says also Clayton told him to write the postal card to Mrs. Connett and what to put in it. He then describes his drive to the graveyard at Sutherland, and then going to the Platte river and taking the endgate from the wagon and carrying the man just down over the bank and there laid him down, "and I took hold of this blanket or cover or skirt, or whatever it was, and I pulled it out from in under his head, and I laid this into the wagon, and I put the endgate into the wagon."

Another unreasonable thing to this story is that he has Clayton asking him what shall be done, and then Clayton does not go with him and does not in any way participate in burying the body. According to the story, the trouble was Clayton's trouble, and he should therefore have hauled the body away to hide it. Then the defendant kept the property and got the money for it when he sold it.

In the light that the defendant testified to an unreasonable and improbable story having no discoverable foundation in fact, and resting only upon a basis of fiction, formulated to deceive the jury and to reduce their verdict from murder in the first degree to manslaughter or murder in the second degree, I see no particular error in the refusal of the court to allow the little girl to testify to a story which was transparent and unreasonable fiction. If the alleged facts concerning the killing of the deceased with a hammer by Clayton never happened, then the little girl could not have truthfully told the story related by the defendant, and so the defendant did not suffer when she failed to recite this Munchausen tale. The mother was probably not called as a witness to the main facts because the defense knew that there was no truth in the story which it had put up, and did not want to subject her to the dangers of a cross-examination.

When Johnny Jones saw Connett and the defendant driving north toward the railroad tracks together, the defendant was taking Connett for his last drive. The

man who had taken possession of Connett and who had zealously kept such possession, was going to kill and bury him. And he was going to keep the team and the harness and the wagon until he could realize their value. This was to be the pay for his trouble and his crime.

Charles Clayton testified that the defendant had said he wanted Connett's team; that on a Sunday afternoon the defendant kissed his mother and little sister good-bye, and Connett shook hands with Mrs. Clayton; that then the defendant and Connett got into the wagon and started for Hershey to work in the hay-field, so they said; that Johnny Jones was there and saw them start; that defendant was sitting on the left side and driving the team, and Connett was on the other side. When defendant came back a week afterwards he told the story that Connett had gone to South Dakota on a teaming job. Defendant at that time seemed to have plenty of money.

Clayton fixed the time when Roy Roberts and Connett and his wife and baby came to the Sund place as Friday, July 31. He also said that Roberts and Connett were there until the next Sunday afternoon, when they went away together. Clayton did not see Connett after that. When the defendant came back he talked to Clayton in such a way as to induce him to believe that there was something wrong. After that he told Clayton that he had been mighty lucky in getting out of a murder case. While Clayton himself had entered a plea of guilty to cattle stealing, there seems to be no credible evidence connecting him with the crime, and that defendant sold the team, wagon and harness while he was gone corroborates Clayton and the story of the crime.

There could be no prejudicial error in excluding the testimony of the little girl, defendant's sister, if the story about to be told was clearly highly colored fiction. The district judge was on the ground and he had the opportunity to examine conditions surrounding this trial and to judge of them. I am unwilling to condemn what he did in excluding the testimony of the little girl.

As to the action of the district court in adjourning the trial from the court-house to the theater, he probably did it with the implied or expressed approval of the county commissioners. Besides, in this country the court is an institution of the people and for their benefit. The writer looks upon the publicity of the court proceedings among the people as a good thing and much to be encouraged, except, of course, a trial should not be produced as a drama, and nothing should be added which converts the facts into a tragedy.

While I realize that the opinion of the court presents a criticism of the proceedings not entirely without some foundation, it does not follow that the things complained of are so prejudicial to the rights of the defendant as to justify a reversal of the judgment of the district court and the increased burden and expense of a new trial. While the strictest enforcement of the more technical rules of the criminal law may possibly sustain the present views of this court as set forth in the opinion, there is a growing tendency among the people, the bench and the bar to let well enough alone. In this case I am not quite able to agree with the views of the majority.

The law presumes the defendant to be innocent until his guilt is established by the evidence beyond a reasonable doubt, and this court will not affirm the judgment of the district court based upon a verdict of guilt unless the defendant has had a fair trial, and the inquiry concerning the defendant's guilt has been conducted without prejudicial error. Unwarranted injury might be done to the defendant by taking the case away from the courthouse to the theater if the theater should be filled with a hostile and demonstrative audience seeking the conviction of the prisoner. Whether the refusal of the court to let the defendant's little sister testify was based upon a sufficient reason we may not know as well as Judge Grimes, who saw the little girl cry and who perhaps heard some of her conversation. Besides, Judge Grimes conversed with the mother, and the mother appears to have given certain rea-

sons for not letting the little girl testify. I desire most earnestly to say nothing that shall in any way be prejudicial to the defendant. His connection with the case and his criminal liability are shown by the majority opinion, in which it is said, among other things: "Defendant and the Connett family drove to the city of North Platte, where Mrs. Connett and the baby took the train for Mason City. Defendant and Connett then returned to the ranch. They remained there that night and until some time the following afternoon. So far there seems to be no conflict in the evidence, Connett was killed, and this defendant disposed of Connett's property, and did other things and conducted himself generally so as to leave no doubt that he had a part in the tragedy that resulted in the death of Connett."

With this statement contained in the majority opinion, I am unable to see how the discussion of the case contained in this dissent can in any way be prejudicial to the defendant. I am unable to coincide with the views of the law expressed in the majority opinion, and I therefore feel called upon to insist upon this dissent.