STATE OF NEBRASKA, APPELLEE, V. JAMES K. NEWMAN, APPELLANT.

140 N. W. 2d 406

Filed February 25, 1966. No. 36034.

Francis D. Lee, T. Clement Gaughan, and Richard L. Goos, for appellant.

Clarence A. H. Meyer, Attorney General, and Richard H. Williams, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, BROWER, SMITH, and McCOWN, JJ.

SPENCER, J.

This is a criminal action instituted in the district court for Holt County charging defendant James K. Newman with murder in the first degree. The jury found the defendant guilty of murder in the second degree. Defendant was sentenced to life imprisonment and has perfected an appeal to this court.

Defendant was charged with the murder of Delbert Addison, the marshal in the village of Stuart, Nebraska, hereinafter referred to as decedent. Defendant does not question the sufficiency of the evidence to sustain the conviction, so no useful purpose will be served by attempting to summarize it. We detail only enough to understand the errors assigned.

On the evening of September 27, 1964, defendant was advised that the decedent had jerked his minor son from an automobile, struck him, and thrown him in jail. The jail at Stuart is located in the same building with the light plant. Defendant immediately went to the jail. According to one Lane, who was an employee at the light plant and who served also as magistrate, defendant was pretty riled up and wanted to know the whereabouts of decedent. Lane testified defendant made remarks about going home to get his gun, and that he was going to shoot the decedent if he made a move or called him a dirty name. This defendant denies. The denial is corroborated by his son who, because the office door was open, could hear the conversation from his cell. Defendant left the jail and thereafter called the county attorney at O'Neill. The county attorney advised him he could be of no help because of his official position, and suggested that he call an attorney. The defendant thereafter reappeared at the light plant and demanded that he be permitted to post bond for his son. Lane testified he told the defendant he would first have to find out what the boy was charged with, and then he would go home to get some bond forms. Lane left and soon thereafter the defendant followed him.

On the way back from his home, Lane stopped to visit with decedent who, with his wife, was sitting in a parked automobile a short distance from the jail. After Lane drove away, the defendant approached the parked car. There is a substantial dispute as to what then occurred. The testimony of decedent's wife would indicate that the defendant tried to precipitate a fight; that the decedent placed defendant under arrest; and that the defendant shot the decedent while he was attempting to take him to jail. The defendant's testimony would indicate that the decedent had a very short temper. Defendant testified that decedent became angry; took off his glasses and badge; and came after the defendant, cursing, and saying he would beat his brains out. De-

fendant testified that he retreated backwards toward his own automobile, with the decedent swinging at him; that when he reached his automobile the decedent had something in his hand which defendant thought was a gun; that when the decedent lunged at him with the object, defendant had reached and was trying to back into his own car; and that his hand touched a gun which was on the front seat. He brought the gun out, but does not remember firing it. The decedent was shot twice, and died at the hospital shortly thereafter.

Defendant's first five assignments of error pertain to what he terms the participation of the county attorney in the case after disqualifying himself so he could appear as a witness for the State. The county attorney, subsequent to the time the defendant was bound over to the district court, signified his intention to appear as a witness for the State, and withdrew his appearance as prosecuting attorney. Pursuant to statute, a special prosecutor was appointed. The name of the county attorney was then endorsed upon the information as a witness for the State. During the impaneling of the jury and the trial, the county attorney sat at the counsel table with the special prosecutor and consulted with him during the prosecution of the case. The evidence is undisputed that the special prosecutor consulted with the county attorney on the peremptory challenges to be exercised. At the time the county attorney was called as a witness, the defendant objected to his competency, "* * * because he has assisted in the prosecution of this case, and in the impanelling of the jury, by consulting with the specially appointed prosecuting attorney."

In Frank v. State, 150 Neb. 745, 35 N. W. 2d 816, we said: "A county attorney, being a quasi-judicial public officer, in whom the public has reposed confidence, his evidence is ordinarily given greater weight than that of an ordinary witness, and the natural tendency in such cases is for defendant to question the fairness of a trial when he becomes a witness for the state. Therefore, he

should, when that becomes necessary, so conduct himself as to foster and demonstrate the fact that he is not actively participating as a prosecutor, but only as a witness, truthfully and impartially giving competent testimony."

On the last day of the trial and after the defense had finished cross-examining the county attorney who was called as a rebuttal witness, the following record was made: "MR. GAUGHAN: Let this record show at this time, on the part of the defendant, that Mr. Griffin is still assisting in the prosecution of this case; that he has been discussing legal matters, or the legality of matters, with the court in chambers; that he has been conferring with the especially appointed prosecutor in this case throughout the trial, on matters pertinent to the prosecution of this case; and sitting at the counsel table with the specially appointed prosecutor throughout the trial; and has been consulting with the special prosecutor throughout the trial on the examination of each witness.

"MR. CRONIN: The State would like the record also to show that the trial of this lawsuit has been wholly and solely conducted by the special prosecutor, who has examined all the witnesses and presented the State's views on all legal questions in open court. The county attorney has been sitting at the counsel table with the special prosecutor; he has been absent from it a part of the time during this trial; and the prosecutor has talked with him at various times during the trial. The original investigation of this crime, on the day following its occurrence was conducted by the county attorney; but all the decisions on what actions to take in the trial of this case have all been made by the special prosecutor.

"MR. GAUGHAN: Would the court care to make a statement?

"THE COURT: The court states that the county attorney, Mr. Griffin, has not presented any legal problems, they have all been presented by Mr. Cronin, the special prosecutor; also that in chambers where some

problems were discussed as to legal matters he was present; all those matters were referred to the special prosecutor, Mr. Cronin."

What is the basis for our rule that an attorney who becomes a witness should withdraw from active participation in the trial of the case? In Roberts v. State, 100 Neb. 199, 158 N. W. 930, Ann. Cas. 1917E 1040, this court said: "To discuss in argument the reliability and weight of one's own evidence is embarrassing to counsel, and sometimes confusing to jurors."

Canon 19 of the Canons of Professional Ethics of the American Bar Association provides: "When a lawyer is a witness for his client, except as to merely formal matters, such as the attestation or custody of an instrument and the like, he should leave the trial of the case to other counsel. Except when essential to the ends of justice, a lawyer should avoid testifying in court in behalf of his client."

The rules adopted by this court creating, controlling, and regulating the Nebraska State Bar Association, provide: "ARTICLE X Rules of Professional Conduct. The ethical standards relating to the practice of law in this state shall be the canons of Professional Ethics of the American Bar Association, including the additions and amendments as of January 1, 1945, thereto, and those which may from time to time be approved by the Supreme Court."

It should not be ignored that the county attorney, in addition to being a witness for the State, is also an officer of the state. The instant case is not too dissimilar from Frank v. State, 150 Neb. 745, 35 N. W. 2d 816, in which we said, relative to the participation of the county attorney: "The most that could be gleaned from the record now before us was that he sat at the counsel table with the special prosecutor and assisted him in the preparation and details of the trial as any other witness or interested officer of the state would have a right to do. As held in Roberts v. State, supra (100 Neb. 199,

158 N. W. 930, Ann. Cas. 1917E 1040), that alone would not require reversal if in doing so he conducted himself in a manner consistent with his position as a witness or his interest as an officer of the state." We are satisfied on the record produced that the county attorney conducted himself in a manner consistent with his position as a witness and his interest as an officer of the state.

Defendant's additional argument on the competency of the county attorney pertains to his contention that he called the county attorney to consult him as an attorney relative to his son's difficulty, and that he should therefore be disqualified to testify to any of the conversation under the provisions of section 25-1206, R. R. S. 1943. There is a dispute as to when the county attorney told the defendant he should consult another attorney. We view the defendant's call in the light that it was a complaint that his son's rights were being violated by the authorities in the village of Stuart, rather than an attempt to employ the services of the county attorney. In any event, anyone consulting with the county attorney must be presumed to know that it is the duty of the county attorney to prosecute law violators, and that the county attorney cannot be disqualified from performing his official duty by statements made to him, because the relation of attorney and client cannot be effected in such situations. There is no merit to defendant's contention.

Defendant's sixth assignment of error complains that the trial court wholly failed to instruct the jury on voluntary manslaughter. The trial court's instruction No. 8 was in the language of section 28-403, R. R. S. 1943, except that the comma appearing in the statute after the words "sudden quarrel" was omitted from the instruction, so that it read, so far as material here: "That the defendant unlawfully killed Delbert Addison without malice, either upon a sudden quarrel or untentionally (sic), while the slayer was in the commission of some unlawful act." It seems to be defendant's argument

that the omission of the comma deprived him of the defense of manslaughter unless the jury found him guilty of an unlawful act. In other words, defendant contends that the phrase *while the slayer was in the commission of some unlawful act* refers to and qualifies the words *or unintentionally* and not the words *upon a sudden quarrel,* and that the comma after the word *quarrel* is necessary to make the statute clear. Under defendant's interpretation, the instruction as given was more favorable to defendant than it would be with the comma. His interpretation would mean that a sudden quarrel, unaccompanied by the commission of some unlawful act, would not constitute manslaughter. The jury returned a verdict under instruction No. 7, covering murder in the second degree, which required a finding that the defendant killed the decedent *purposely and maliciously.* Under the circumstances here shown, defendant was not prejudiced by the omission of the comma in instruction No. 8.

Defendant's seventh assignment of error is directed to the refusal of the court to give a tendered instruction on voluntary manslaughter. The essence of the instruction was given, except that the trial court did not incorporate therein the reason the defendant gave for his provocation. With the exception noted in the omission of a comma from the language incorporated from the statute, the instruction given was adequate.

Defendant's assignment of error No. 8 complains of the giving of instruction No. 13, directing the jury that it was the sole judge of whether certain alleged admissions were voluntarily and intelligently made by the defendant. Defendant has not seen fit to argue this assignment in his brief. Our only observation is that the failure to have given it would have been error.

Defendant's ninth assignment of error involves the rejection as evidence of a newspaper containing a photograph purporting to identify the location of the shooting, with a broken line drawn thereon purporting to

show the bloodstained route the decedent traveled as his wife assisted him to their car. The photographer testified the photograph was made 2 days after the killing, and admitted that the marks thereon were drawn from gossip he picked up relative to the event. The exhibit was properly excluded. A photograph to be admissible must be a true representation of the person, place, or thing which it purports to represent before it is competent as evidence. See Fugate v. State, 169 Neb. 420, 99 N. W. 2d 868. Actually, if admitted, the photograph would have tended to substantiate the State's evidence rather than that of the defendant, because it locates the shooting considerably behind the defendant's car.

Defendant's assignment of error No. 10 is more serious because it involves the exclusion of the testimony of two witnesses who saw the decedent strike the defendant's son. While this incident occurred approximately 2 hours before the shooting, there is no question it was a precipitating factor. These witnesses were permitted to testify that the general reputation of decedent for violence, turbulence, and bloodthirstiness was bad, but they were not permitted to testify as to statements made by the decedent while he was taking defendant's son to jail, nor to the fact that they saw him strike the boy at that time. Defendant's son was permitted to describe the event in detail. The defendant was permitted to testify as to what his son told him, as well as to what he was told by the men who come to his home to tell him his son was in jail. One of these witnesses was permitted to testify that he told the defendant that there were four witnesses who would go to court and say that they had seen the decedent strike his son.

If we assume this evidence was admissible, we cannot say its exclusion was prejudicial error, in view of the fact that it had been otherwise elicited, could be considered cumulative, and the defendant was permitted to testify as to what he was told about it and its effect upon him. The admission or rejection of cumulative evi-

dence is ordinarily within the discretion of the trial court, and a ruling thereon will not be held erroneous unless an abuse of such discretion clearly appears. See Edmonds v. State, 163 Neb. 323, 79 N. W. 2d 453.

The eleventh and last assignment of error is directed to the fact that the court permitted definitions of certain words to be read in evidence from Webster's New International Dictionary (2d Ed.), Unabridged. While the special prosecutor for the State was cross-examining a witness produced by the defense to prove the bad reputation of the decedent, the following colloquy took place: "Q. Well, Gene, if I told you the meaning of the word 'Bloodthirstiness' as defined in Webster's New International Second Unabridged Dictionary, was 'Eager to shed blood, cruel, sanguinary, murderous,' would you say that the deceased, Delbert Addison was that kind of man? A. No. Q. Would you say that he had that kind of reputation at Stuart? MR. LEE: Your Honor, I object to that question as leading and suggestive, and something drawn from context; if he wishes to give a definition lets get the book here which gives the whole context; he asked if this said dictionary shows thus and so; I think if we take any part, it should all be in here. * * * (Short recess). * * * MR. CRONIN: I now have the dictionary I referred to in my examination of this witness here on the table; can we now stipulate to the definition? MR. GAUGHAN: No, Your Honor, I will object to this on the general grounds unless we get a legal definition from the court, because in my opinion the definition in this book is incompetent to be taken as a part of the evidence in this case before the court. THE COURT: Overruled. Defendant excepts. * * * Q. I call your attention now, Gene, to the word 'Bloodthirsty' which appears on page 292 of the book you just identified here; will you read the definition of the word 'Bloodthirsty' as shown in this book? MR. GAUGHAN: I will object to this as not proper cross examination; there was nothing in the direct examination in this case

that referred to Webster's dictionary, Your Honor. THE COURT: Overruled. You may answer. Defendant excepts. A. 'Eager to shed blood, cruel, sanguinary and murderous.' Q. Now, Gene, you don't want to tell this jury, do you, that Mr. Addison had a reputation in the Stuart, Nebraska, community for being blood thirsty, as defined in that dictionary, do you? MR. GAUGHAN: That is objected to as not proper cross examination, unless the definition of all the words given in that definition in that dictionary are given to the witness; a definition of all the words would certainly be necessary to show the true meaning, if this is to be permitted. THE COURT: Definition of what words, Mr. Gaughan? MR. GAUGHAN: Cruel, sanguinary, murderous; all of them separately and not all together; all those synnonyms (sic). THE COURT: How many of those words are there, Mr. Cronin? MR. CRONIN: Four, Your Honor. THE COURT: I will sustain that objection." The assignment of error is directed to the admission thereafter of the definition of all of the words requested into evidence. It appears to us that the defendant's counsel invited the offer and is in no position to challenge it.

For the reasons given, we have concluded that there is no error in the record herein sufficiently prejudicial to require the granting of a new trial, and the judgment of the trial court should be and is affirmed.

AFFIRMED.