# 𝔖taunton

## O. A. HUFFMAN v. COMMONWEALTH OF VIRGINIA.

September 11, 1946.

Record No. 3117.

Present, Holt, Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*George W. Chaney*, for the plaintiff in error.

*Abram P. Staples, Attorney General*, and *M. Ray Doubles, Assistant Attorney General*, for the Commonwealth.

EGGLESTON, J., delivered the opinion of the court.

O. A. Huffman was convicted by a jury of murder in the second degree and his punishment fixed at twenty years in the penitentiary for the killing of Blair Gearheart. He

asks us to reverse the judgment entered on the verdict on two grounds: (1) The verdict was plainly contrary to the evidence in that no malice was shown, and the wound which resulted in Gearheart's death was inflicted in self-defense. (2) The court erred in not excluding the witnesses from the courtroom on the motion of the accused.

A third assignment, that a new trial should have been granted on the ground of after-discovered evidence, was abandoned at the oral argument before us and need not be considered.

The evidence discloses that between ten-thirty and eleven p. m., on December 5, 1944, Blair Gearheart, his brother, King Gearheart, Landon F. Overby, and Jake Ferguson went into the City Lunch Room on Commerce street, in the city of Roanoke. The place was crowded, and the men seated themselves in a booth near the rear of the lunchroom and ordered beer. After a few minutes Overby got up and proceeded towards the men's lavatory and in doing so brushed against Huffman who was returning therefrom. The men were strangers to each other. Overby apologized but Huffman was not inclined to accept the apology, cursed Overby several times and argued with him.

At this point Blair Gearheart, who was aware of the fact that Overby was intoxicated, left his seat in the booth and proceeded to the couple for the purpose of inducing Overby to withdraw from what appeared to be an approaching altercation. On reaching the two men, Gearheart said to Overby, "What is the trouble here, Landon?" to which Overby replied that he had accidentally "bumped into" Huffman but had apologized. Gearheart then remarked to Huffman: "Why don't you let the man alone and let him go on, you see he is drinking." In reply Huffman cursed Gearheart and struck at him. In retaliation Gearheart struck back, slapped Huffman in the face with his open hand, and a fist fight ensued between the two men. During the encounter the two participants "went into a clinch," and while in this situation Huffman drew from his pocket an open

knife and stabbed Gearheart. Gearheart then threw Huffman to the floor.

At this point King Gearheart, who, up to this time, had remained seated in the booth, approached the two men and put his arms around Blair Gearheart to prevent his further fighting. Blair Gearheart remarked to his brother: "King, he has cut me; that boy has cut me." King Gearheart, who had seen Huffman drop the open knife into his right-hand trousers' pocket, grabbed and held Huffman's arm behind his back until the police arrived a few minutes later. In the presence of the police King Gearheart reached into Huffman's pocket, retrieved the open knife and handed it to one of the officers.

The Commonwealth further proved by a witness, Lundgren, who was seated on a stool at the lunch counter and attached to none of the parties involved in the affray, that after the initial incident in which Overby brushed against Huffman, Huffman left Overby near the rear of the room and proceeded towards the front; that Huffman then apparently changed his mind, took his knife from his pocket, opened the blade, replaced the open knife in his pocket, returned towards Overby and resumed the argument. Lundgren corroborated the testimony of the other witnesses for the Commonwealth that the cutting occurred while Huffman and Blair Gearheart were "in a clinch," and before Huffman was knocked or thrown down by Blair Gearheart.

It is true that Huffman testified that at the time of the cutting he was lying prone on the floor on his back, was being choked by Blair Gearheart, and that he stabbed Gearheart in order to save his own life. However, the jury declined to accept that version of the incident and, of course, its finding is binding on us.

The blow struck by Huffman was of such severity as to cut through Gearheart's heavy winter overcoat and sweat shirt, inflict a wound six inches long, three inches deep, and split the left sixth rib. The wound caused a collapse of the left lung and a "massive hemorrhage" from which Gearheart died three days later.

 It is plainly apparent from this analysis of the evidence that the jury was fully warranted in its verdict of murder in the second degree. The killing was accomplished with a deadly weapon. The general rule in this jurisdiction is that, in the absence of evidence of palliating circumstances, malice may be presumed from proof of the killing. *Roark* v. *Commonwealth*, 182 Va. 244, 252, 28 S. E. (2d) 693, 696; *Coleman* v. *Commonwealth*, 184 Va. 197, 202, 35 S. E. (2d) 96, 98.

Under the Commonwealth's version of the incident, which the jury has accepted, there were no circumstances of palliation.

Moreover, every homicide is *prima facie* murder in the second degree, and the burden is on the accused to reduce the grade of the offense or justify the killing. *Nelson* v. *Commonwealth*, 168 Va. 742, 750, 191 S. E. 620, 624.

Then, too, regardless of the antecedent provocation, the accused armed himself with a deadly weapon, left a place of safety near the front of the cafe, returned to the rear of the room and resumed the argument with Overby. From that point on he was clearly the aggressor in the altercation. He could not thereafter rely upon self-defense or provocation which was induced by his own belligerent conduct. *Honesty* v. *Commonwealth*, 81 Va. 283, 298; *Jackson* v. *Commonwealth*, 98 Va. 845, 848, 36 S. E. 487; *Sims* v. *Commonwealth*, 134 Va. 736, 748, 115 S. E. 382.

At the outset of the trial, counsel for the accused moved the court to "separate the witnesses" or exclude them from the courtroom on the ground, among others, that there were a number of witnesses for the Commonwealth who had "different versions" as to what happened. The motion was immediately overruled even though the Commonwealth's attorney had interposed no objection thereto. After exception had been taken to this ruling the Commonwealth's attorney stated to the court that he was convinced from his interviews with the Commonwealth's witnesses that there would be no "conflict or disagreement as to how the crime actually

took place." Although counsel for the accused again insisted that a separation of the witnesses was vital to the defendant, the court again overruled the motion. This ruling is the basis of the second assignment of error.

In Wigmore on Evidence, 3d Ed., Vol. 6, sec. 1837, p. 347, that distinguished author says: "The expedient of *separating a party's witnesses,* in order to detect falsehood by exposing inconsistencies, seems to have been early discovered and long practiced in various communities."[1]

Mr. Wigmore reasons (sec. 1839, p. 357 *ff.*) that the right to have the witnesses separated "seems properly to be demandable as of right, precisely as is cross-examination." However, he concedes (pp. 358, 359) that only a "few courts" adopt that view and that "the remainder, following the early English doctrine, hold it grantable only in the trial court's discretion; declaring usually, however, that in practice it is never denied, at any rate for an accused in a criminal case."

See also, 53 Am. Jur., Trial, sec. 31, p. 47; 23 C. J. S., Criminal Law, sec. 1010, p. 377 *ff.,* and numerous cases there cited.

In some jurisdictions the matter is regulated by statute.

Among the large number of cases dealing with the subject we will refer to a few of the more recent ones.

In *People* v. *Cooke,* 292 N. Y. 185, 54 N. E. (2d) 357, 360, a capital punishment case, the appellate court sharply criticized the action of the trial court in not granting the motion of the defendants for the exclusion of the witnesses, saying: "It is hard for us to understand what reason there is,

---

[1] Mr. Wigmore traces the possible genesis of the rule to the story of Daniel's judgment in the History of Susanna, as related in the Apocryphal Scriptures. There the beautiful and virtuous wife of Joachim was convicted and sentenced to death for adultery on the testimony of two elders whose advances she had repulsed. On the way to her execution Daniel intervened and by insisting upon the examination of the two accusing witnesses separate and apart from each other, disclosed discrepancies in their stories which resulted in Susanna's acquittal and the infliction of the death penalty upon her accusers. Wigmore on Evidence, 3d Ed., Vol. 6, section 1837, p. 347; Wigmore's "A Kaleidoscope of Justice" (Washington Law Book Co., 1941), p. 658.

or could be, for such a ruling, or why such a motion should not be granted as of course, especially in a capital case." Nevertheless, it is held that the matter was within the discretion of the trial court and that its ruling was not reversible error.

To the same effect, see *Romary v. State* (Ind.), 64 N. E. (2d) 22, 24.

On the other hand, in *Ray v. Commonwealth*, 241 Ky. 286, 43 S. W. (2d) 694, 696, it was held that the refusal of the trial court to order a separation of the witnesses, as requested by the accused, was an abuse of discretion and reversible error.

In *Jones v. State* (Md.), 45 A. (2d) 350, 353, 354, the court, after quoting with approval the statement in Wigmore on Evidence, 3d Ed., Vol. 6, sec. 1839, p. 358, that "The most that ought to be conceded to the judge is to refuse an order of sequestration where it does not appear to be asked in good faith," said that the motion "should be granted," as a matter of course, "in capital and other serious criminal cases." The refusal of the trial court to grant the motion was held to be an abuse of discretion and reversible error.

In *State v. Carter*, 206 La. 181, 19 So. (2d) 41, 42, 43, it was said: "If the discretion vested in the trial judge is arbitrarily and unreasonably exercised to the prejudice and injury of the defendant in obtaining a fair and impartial trial, his action in that respect should be set aside by granting a new trial." There it was held that since the record disclosed no reason why the segregation of the witnesses had not been directed, other than the belief by the trial judge that his discretion in the matter was "absolute," the failure to grant the motion was reversible error.

See also, *Holder v. State*, 136 Fla. 880, 187 So. 781, 782; *Roberts v. State*, 100 Neb. 199, 158 N. W. 930, 932, Ann. Cas. 1917E, 1040.

In this State we have no statute dealing with the precise situation at hand.

Code, sec. 4843, deals with the separation of witnesses in preliminary examinations before magistrates. That section, of course, has no application here.

Code, sec. 4906, provides: "In the trial of all criminal cases, whether the same be felony or misdemeanor cases, the court may, in its discretion, exclude from the trial any or all persons whose presence is not deemed necessary."

It will be observed that this statute does not in terms deal with the particular situation, nor was it designed for that purpose.

Neither does the precise point seem to have been previously presented to this court. In *Hey* v. *Commonwealth*, 32 Gratt. (73 Va.) 946, 34 Am. Rep. 799, *Jackson* v. *Commonwealth*, 96 Va. 107, 30 S. E. 452, and *Burford* v. *Commonwealth*, 179 Va. 752, 20 S. E. (2d) 509, we dealt with the kindred question as to whether the trial court should have permitted a single witness to remain in the courtroom and testify after all other witnesses had been excluded. In each of these cases we held that the matter was within the sound discretion of the court and that no reversible error had been committed under the particular circumstances involved.

In this State the motion of an accused, seasonably made in good faith, to have the witnesses excluded from the courtroom, or "put under the rule," is usually granted as a matter of course, unless there be a showing of some good reason for its denial. The fact that this has been the universal practice in the trial courts probably accounts for the lack of a prior ruling by this court on the subject.

However, this does not mean that such a motion of the accused is grantable as a matter of right. We are of opinion that the rule laid down by the great weight of authority is sound, that neither the accused nor the Commonwealth, as a matter of right, is entitled to have the witnesses separated, but that the matter is one within the sound discretion of the court, subject to review and reversal upon a showing of abuse of discretion or prejudice resulting therefrom.

In the case before us we can not understand why the motion of the accused for a separation of the witnesses was denied. The trial court gave no reason for its ruling and the record discloses none. Although the motion was made at the beginning of the trial and in good faith, it was arbitrarily overruled even though the Commonwealth's attorney had not opposed it. The statement of the prosecuting attorney, made to the court after its ruling, that he had found from his interviews with the prosecuting witnesses that there was "practically no conflict or disagreement as to how the crime actually took place," seems to us to be a reason why the motion should have been granted rather than denied. The very fact that the several prosecuting witnesses told the same story made it all the more important, from the standpoint of the accused, that they be examined separately and apart in order that the truth of their statements or the accuracy of their memories might be probed for inconsistencies. Vital factors in the case were whether the accused was the aggressor in the encounter, whether he returned to the affray with an open knife, or whether the cutting occurred before or after he had been knocked or thrown to the floor.

In the order named, King Gearheart, the brother of the deceased, Overby, and then Lundgren related what occurred on the fatal night. These witnesses detailed substantially the same account of the affray. Admittedly, Overby was partly intoxicated at the time, and yet he had the benefit of hearing his companion, King Gearheart, testify. While Lundgren was not connected with the Gearheart party, he was an important witness for the Commonwealth and he had the benefit of hearing the testimony of the two preceding witnesses.

Contrast the situation in *Burford* v. *Commonwealth, supra*, in which the witness, Thompson, who was allowed to remain in the courtroom over the objection of the accused, was the first to relate the manner in which the alleged offense of unlawful wounding occurred. For that reason we held that

the failure of the court to exclude this witness was not prejudicial error.

On the whole we are of opinion that, under the circumstances stated, the refusal of the trial court to grant the motion of the accused for the exclusion of the witnesses from the courtroom during the trial was arbitrary, was an abuse of discretion, and constituted reversible error.

For this reason the judgment is reversed and the case is remanded for a new trial.

*Reversed and remanded.*