15941

STATE v. O'NEAL ET AL.

(42 S. E. (2d) 523)

*Messrs. J. A. Hutto, C. T. Graydon* and *John Grimball,* all of Columbia, for Appellants, cite:

*Mr. T. P. Taylor, Solicitor,* of Columbia, for Respondent, cites:

May 1, 1947.

FISHBURNE, AJ.: The defendants, Douglas, alias "Doug" O'Neal, George Walker, and Joseph Harris, were tried in the court of general sessions for Richland County and found guilty of keeping and maintaining a gaming house, in violation of Section 1738, 1942 Code. From the judgment of the court and from the order refusing their motion for a directed verdict, made at the close of the testimony offered in behalf of the state, they appeal to this court.

Error is assigned because the court permitted the indictment to be amended with reference to a misnomer affecting the defendant, Joseph Harris, and in refusing to quash the indictment upon this ground. After the trial of the case had commenced and two jurors had been accepted but not sworn, counsel for the appellant, Joseph Harris, moved to quash the indictment because the accused was erroneously named therein as Earl Harris. Thereupon the court granted the motion of the solicitor to amend the indictment by substituting the name of Joseph Harris for Earl Harris, without resubmitting the indictment to the grand jury.

Section 1005 of the Code of 1942 provides:

"If there be any defect in form in any indictment it shall be competent for the court before which the case is tried to amend the said indictment: Provided, such amendment does not change the nature of the offense charged  *  *  *".

The provisions of this Code section were construed and applied in the case of *State v. Blackstone,* 113 S. C. 528, 101 S. E. 845, in which the indictment charged violation of the prohibition law. The facts in that case insofar as they relate to misnomer, are practically parallel with the facts appearing here. Blackstone was indicted in the name of J. F. Blalock, alias Blackstone. Upon call of the case for trial, a motion to quash the indictment was made on the ground of misnomer, it being shown by affidavit that the defendant's true name was A. S. Blackstone. The motion to quash was overruled, the amendment was allowed,

and the true name of the defendant inserted in the indictment without resubmission to the grand jury. Upon appeal, this court sustained the action of the lower court upon the ground that the amendment did not change the nature of the offense charged. And see *State v. McGill,* 191 S. C. 1, 3 S. E. (2d) 257. The appellant in this case did not suggest that he was not the person charged, or that by mistake in identity he had been substituted for the real person.

The exceptions raising this issue cannot be sustained for another reason. It appears from the record that before the indictment was returned by the grand jury, Joseph Harris was arrested for this same offense under a warrant issued from the recorder's court for the City of Columbia, in which he was named as Earl Harris. Upon his arrest, he filed bond under the name of Joseph Harris for his appearance before the court of general sessions. He was indicted by the grand jury under the name of Earl Harris, a bench warrant was issued for his arrest in that name, and he again gave bond in the name of Joseph Harris. It is evident that the clerk of the city court and the clerk of the circuit court failed to note the discrepancy in the name under which the two bonds were filed. Upon the call of the case, the defendant, Joseph Harris, together with his co-defendants, pleaded not guilty, and the trial of the case had proceeded to the stage where at least two jurors had been accepted before the motion to quash was made.

It is generally held that by pleading to the charge an accused waives a misnomer in an indictment or information, and thereby admits that the name by which he is charged is his true name, 42 C. J. S., Sec. 306, Page 1337.

It was held in *The State v. Thompson,* Cheves' Law, 31 (25 S. C. L.), that after a prisoner has pleaded not guilty he may not avail himself of a misnomer in the indictment, either on his trial or in arrest of judgment, or on motion for a new trial. It was observed in that case that there was no hardship in the rule; for the prisoner lost no advantage or privilege by it on trial, and, if he had need afterwards to

resort to a plea of *autrefoits convict,* he would be allowed to show that he was the same person theretofore convicted. To the same effect see *State v. Faile,* 43 S. C. 52, 20 S. E. 798.

Nor did the trial court err in directing the appellants to stand as their names were called, for the purpose of being identified by the prosecuting witness. While the witness, Mr. Bracey, was testifying, he undertook to identify the three appellants as the persons with whom he played poker in an alleged gaming house located on Main Street in the city of Columbia, known as the Five O'clock Club. He described the appellant, Walker, as "the one sitting to the right there (indicating); the big fellow in the grey suit." Whereupon the court directed Mr. Walker to stand up for a more complete identification.

In many cases a question has been raised as to whether the accused can be compelled to exhibit himself for the purpose of identification or of comparison with evidence introduced on the trial. The authorities are not in harmony. 14 Am. Jur., Sec. 152, Page 875. But we agree with those cases which hold that the constitutional provision that no person shall be compelled to be a witness against himself, is not violated by compelling the defendant in a criminal case to stand up for the purpose of identification. *People v. Gardner,* 144 N. Y. 119, 38 N. E. 1003, 43 A. S. R. 741, 28 L. R. A. 699; *People v. Oliveria,* 127 Cal. 376, 59 Pac. 772; *State v. Reasby,* 100 Ia. 231, 69 N. W. 451.

The rule on the subject of bodily exhibition of the accused in a criminal case is well stated by Mr. Wigmore in his work on Evidence. He says (Sec. 2265):

"If an accused person were to refuse to be removed from the jail to the court room for trial, claiming that he was privileged not to expose his features to the witnesses for identification, it is not difficult to conceive the judicial reception which would be given to such a claim. And yet no

less a claim is the logical consequence of the argument that has been frequently offered and occasionally sanctioned in applying the privilege to proof of the bodily features of the accused. The limit of the privilege is a plain one. From the general principle (*ante,* Sec. 2263) it results that an inspection of the bodily features by the tribunal or by witnesses cannot violate the privilege, because it does not call upon the accused as a witness, *i. e.,* upon his testimonial responsibility. That he may in such cases be required sometimes to exercise muscular action, as when he is required to take off his shoes or roll up his sleeve, is immaterial, unless all bodily action were synonymous with testimonial utterance; for, as already observed (*ante,* Sec. 2263), not compulsion alone is the component idea of the privilege, but testimonial compulsion. What is obtained from the accused by such action is not testimony about his body, but his body itself. Unless some attempt is made to secure a communication, written or oral, upon which reliance is to be placed as involving his consciousness of the facts and the operations of his mind in expressing it, the demand made upon him is not a testimonial one. Both principle and practical good sense forbid any larger interpretation of the privilege in this application, and healthy judicial opinion has frequently pointed this out with force."

It is the right of the prisoner to be in the presence and view of the jury, and it is the right of the prosecution to have him in the view of the presiding judge and jury, and the counsel engaged in the trial. And whether at any particular time he shall stand up or sit down in the presence of the jury must be a matter resting in the discretion of the trial judge. In no sense can it be said that by the wise exercise of such discretion his constitutional right is involved. Supporting this view, see Annotation, Ann. Cas., 1912-D, 263.

Error is assigned because the court, over objection, permitted the witness, Bracey, to testify to certain statements made to him by Aileen Thompson, a waitress in the Five

O'clock Club, which were not made in the presence of the defendants who are charged in the indictment with operating the Five O'clock Club as a gaming house. Bracey testified that Aileen Thompson, between two and three o'clock on the morning of April 30, 1946, while he was in the Club, "asked me if I would like to go play some poker." It was later shown by the state that the poker room adjoined and was entered from the barroom of this night club, and that it was upon her suggestion that he entered the gaming room for the purpose of gambling. The court overruled the objection, holding that the testimony was competent because the Thompson girl was employed at the club as a waitress.

It is not necessary for this court to say whether the admission of this testimony constituted error or prejudicial error. An examinaion of the record shows that counsel for appellant brought out the same evidence upon their cross-examination of the witness, Bracey. In response to counsel's question, "But it didn't take any persuasion to get you in the game, did it?," the witness replied: "The girl asked me twice to come in the game." At another point, counsel for appellants asked Bracey, "You say, about what time was it that the young lady asked you to go and play poker?" And the witness answered, "Between two and three o'clock."

An objection to the admission of evidence is waived where the same or similar evidence has been elicited by the objector. 64 C. J., Sec. 193, Page 172. Under this well known rule, the appellants are in no position to complain of the court's ruling.

Before the first witness was sworn in the trial of the case, counsel for appellants moved that the witnesses be segregated. The motion was made generally, without stating any particular ground. It was overruled, and the appellants assign error.

The granting or refusing of a motion for separation or sequestration of witnesses is within the sound discretion of the trial judge. It is within the power of

the trial court to exclude witnesses from the court room during the trial, and to direct that they shall be examined out of the hearing of one another, or shall be "put under the rule," as it is frequently termed. 23 C. J. S., Sec. 1010, Page 377.

While an order excluding witnesses is as a matter of fact rarely withheld if it is applied for by either party in good faith, as a general rule the party is not entitled to an order of exclusion as a matter of right and the motion may be refused if the court in the exercise of a sound discretion does not deem that there are sufficient grounds therefor.

A careful examination of the record does not convince us that there was an abuse of discretion by the court in refusing to exclude the witnesses from the court room during the trial. The exceptions raising this issue are therefore overruled.

Appellants contend that the court erred in its refusal to direct a verdict in their favor on the ground that there was no testimony tending to prove their guilt. This claim makes it necessary to give a brief review of the evidence.

The appellants were indicted, as stated, for the crime of keeping a gaming house known as the Five O'clock Club. This night club was licensed in the name of and operated by the appellant, Douglas O'Neal, as owner. On the night of April 30, 1946, the witness, Bracey, who was visiting Columbia from his home in Virginia, went to the club about ten o'clock. The club was located on the second floor level of the building, and entrance to it was gained by a stairway on Main Street. The club comprised three rooms: One being used as a room for entertainment, where dancing was engaged in; another room or compartment was known as the "stag" side, and contained two bars; and there was a third room, much smaller, in which there were two tables, which adjoined the stag room.

About two or three o'clock in the morning, after Bracey had indulged in several drinks of whiskey, a waitress, Aileen Thompson, who was employed and paid by the appellant,

Douglas O'Neal, approached Bracey and asked him if he would like to play some poker. After some short delay, Bracey entered the small room and found a poker game in progress, being participated in by four or five soldiers and the appellants, Walker and Harris, and another man named Whittle, described as the official "bouncer" of the establishment. The appellant, Harris, sold Bracey $10.00 worth of poker chips and he entered the game. He proceeded to gamble until about twelve o'clock the following day. As the game proceeded, the soldiers dropped out, and for the last eight or ten hours only Bracey, Whittle, and the two appellants, Walker and Harris, participated. The stakes were increased in value from twenty-five cents a chip to $1.00, and when the game concluded Bracey, who was dazed from the effects of liquor, had lost in the neighborhood of $4,000.00.

During a great part of the time, appellant, Walker, who called himself the "house man", did most of the dealing. At other times, the appellant, Harris, who acted as "banker" of the game and who sold the chips and handled the cash, dealt the cards. A short while, in which Bracey dealt, both Walker and Harris claimed the right to cut the deck before the cards were dealt.

There was testimony that Douglas O'Neal was manager of the club and Walker was manager of the gambling room, and that the latter paid Whittle from the cash box. There was also evidence from which the conclusion could reasonably be drawn that a certain percentage of the amount staked on each game was deducted by Harris for the benefit of the "house." The evidence for the state also showed that some time during the morning, before the game finally broke up, Douglas O'Neal approached the state's witness, Bracey, and asked him if he would like to have a cup of coffee.

Around midday two friends entered the club in search of Bracey, and realizing his condition went out and reported the situation to the city detectives. They then returned to the club and took Bracey to his hotel.

It is the general rule that where the proprietor of a ■ place not kept for the purpose of gaming, allows gaming to be carried on, in which he participates, or from which he in some way receives a benefit, he may be convicted as the keeper of a gaming place. *State v. Chase,* 17 N. D. 429, 117 N. W. 537, 17 Ann. Cas. 520; *Shepard v. Dye,* 137 Wash. 180, 242 P. 381, 49 A. L. R. 824; Annotatation, 15 A. L. R. 1202.

The rule is also well established that a person having ■■ general charge of a gaming place as an employee may be convicted of the offense of keeping a gaming house. *State v. Harbourne,* 70 Conn. 484, 40 L. R. A. 607, 66 A. S. R. 126, 40 Atl. 179; *Stevens v. People,* 67 Ill. 587. The fact of agency need not be proved by direct evidence, but may rest in inference from facts and circumstances and the conduct of the parties.

From the above cited authorities as applied to the ■ facts in this case, it is clear that there was sufficient evidence to take the case to the jury, and that the trial judge committed no error in his refusal to direct a verdict of not guilty.

Judgment affirmed.

BAKER, CJ., STUKES, TAYLOR and OXNER, JJ., concur.