16968

THE STATE, Respondent, v. R. C. WILLIAMS, Appellant

(85 S. E. (2d) 863)

*Messrs. W. T. Bolt, Paul Culbertson,* and *Marshall Abercrombie, of Laurens, for Appellant*.

*William T. Jones, Esq., Solicitor,* of Greenwood, *for Respondent.*

February 16, 1955.

BAKER, Chief Justice.

At the November (1953) term of the Court of General Sessions for Laurens County, the defendant-appellant was tried on an indictment charging him with the murder of Eugene Davenport. The trial resulted in his conviction of murder, without recommendation to mercy, and he was duly sentenced to suffer death by electrocution.

The appellant was on the evening of the shooting, October 21, 1953 (the deceased dying two days later), serving a sentence on the Laurens County chain gang, and was locked up for the night with all the other prisoners at this camp, with the exception of the cook, in a building known as the "stockade" or "bull pen." There were three white guards, all of whom were referred to as "Captain," and whose names were Eugene Davenport, J. W. Elmore and W. I. Elledge. The shot fired and which killed Mr. Davenport was fired from the inside of the stockade or bull pen from the pistol of guard Elmore, either during the process of the appellant taking the pistol from Elmore, or *immediately* thereafter. A controversial issue in the case was whether the firing of this bullet was accidental or intentional, the appellant admitting that he was in the virtual possession of the pistol when it was fired.

The three guards named above were on duty that night, and were in a house used by them within a short distance from the stockade. The prisoners in the stockade were engaged in holding a "kangaroo court," and administering punishment to a new prisoner. Sufficient tumult or noise was created thereby to cause the guards to send word by the cook of the camp, who was also serving a sentence but who did not sleep in the stockade with the other prisoners,

for them to quiet down. When the cook reached the stockade, the appellant was engaged in administering the last of the punishment which the "kangaroo court" had decreed to be administered, and he and the said cook got into a heated argument. During this argument, according to the appellant, the following occurred:

"Q. After you gave him the lick what happened? A. Just as I hitting the last lick Johnny come to the window.

Q. Who was that? A. Johnny Gary.

Q. The cook? A. Yes, sir.

Q. All right. A. He came to the window and he hollered in there. He didn't holler in there to nobody but me. He said, 'Junior, Junior.' I said, 'What?' He said, 'Captain Jud said stop whipping that boy.' I done told Johnny, 'You ain't no boss man. You know that. You're a prisoner just like us. You go back and tell Captain Jud that he the boss man. We get him to tell us what to do and what not to do.' That's what I told him.

Q. Did you send any message to any of the Captains cursing them or anything? A. No, sir, I didn't cuss them.

Q. Did you cuss at all while talking to him? A. He said, 'Didn't matter a damn with him.' I said, 'Didn't matter a damn with me.' I said, 'Get away from that window.' And I got the bottle and just stuck the bottle in my hip pocket. * * *"

The cook (John Henry Gary) testified in part as follows:

"Q. John, do you remember the 21st day of October, 1953? A. Yes, sir.

Q. Did you have occasion to see the defendant that day? A. Yes, sir, yes, sir.

Q. Were you out there near the bull-pen? A. I was standing in the back door at sun-down, just about dusk-dark.

Q. Did you go out there that way at all? A. Not until Captains give me orders to go out.

Q. Did you hear any noise or any ruckus or anything out there? A. Heard the noise out there, beating on something another out there.

Q. Beating on something out there? A. Yes, sir. I didn't see it right at that time. After I goes out there.

Q. Did you go out there to go in the place? A. No, sir.

Q. Did the Captains send you out there to go in the place? A. No, sir, he said go to the window.

Q. To do what? A. Quit whipping that man.

Q. Did you go out there? A. Yes, sir.

Q. What was going on? A. A couple of them had him aholding him and had him stretched out like you skin a rabbit.

Q. Who had what? A. This man he was beating.

Q. Who was beating him? A. R. C. was beating him.

Q. Beating on whom? A. Johnny Harris I think they call him. I don't know the name.

Q. Was he an old or new prisoner? A. A new one.

Q. Any other new ones before this happened or was he the only one? A. Slip my memory about that. I couldn't tell you.

Q. Had him stretched out where in there? A. A little aisle go down through the bull-pen. They had him up over the floor.

Q. They had him up over the floor? A. Yes, sir. He wasn't on the floor. They had him up just off the floor.

Q. Which was turned up, his stomach or his backside? A. His stomach down and his backside up.

Q. His stomach down and his backside up? A. That's right.

Q. He have on his clothes or not? A. Yes, sir, had his clothes on.

Q. Had his clothes on? A. Yes, sir.

Q. What did you say R. C. Williams was doing? A. R. C. had a strop. He was beating him.

Q. Where? A. Across the hip.

Q. Right across here? (Indicating.) A. Yes, sir.

Q. What did you say? A. I told him, 'R. C., Captain Jud' said break it up, don't hit that man no other lick.' He said—

Q. What did he say? A. He said, 'Damn what the captain say. You ain't no boss.' I said, 'I'm only giving you what he said.' He said, 'God damn what the captain said. You tell them that I said that.'

Q. 'God damn what the captain said.' A. 'Tell them I said that.' I walked over from the window. He said, 'You son-of-a-bitch you.'

Q. Who is that talking all that time? A. R. C., R. C. Williams.

Q. You mean the defendant in this case? A. Yes, sir.

Q. Go ahead. A. I asked him, 'If you think I'm scared to tell the boss? He said, 'Go tell him, you son-of-a-bitch. I'll kill you. I'll get you in the morning.'

Q. Go tell the son-of-a-bitch? A. He said, "I'll get you in the morning.'

Q. What else? A. 'If you open this door, I'll kill you now.'

\* \* \*

A. I went on in the house and told the captains what he said.

Q. What did you all do? A. They said, 'We'll go out and talk with him and see what's wrong with him.' "

It is presumed that the cook told the guards his version of the message from the appellant. Whereupon all three of the guards, accompanied by the cook, went out to the "stockade" and "Captain Jud" Elmore entered same, leaving the other two guards on the outside, although the deceased stood in or immediately in front of the open door. It was while the guard, Elmore, and the appellant were talking that appellant wrested such guard's pistol from him, and during such tussle, or immediately following and when the appellant was partially or wholly in the possession of the pistol that it was fired, the bullet then fired being the one to strike Captain Davenport, resulting in his death.

It will be observed from the foregoing that the only witnesses to the shooting of Captain Davenport were prisoners who were serving time at this Laurens County chain gang camp, and the other two guards, employees of said county, and the record discloses that at the time of the trial of the appellant were still employed in the same capacity.

Upon the completion of the selection of the jury to try the appellant, his counsel made a motion for the sequestration of the witnesses for the prosecution. Without any inquiry of any description, the trial Judge promptly refused the motion, tersely stating: "I don't see any necessity for that, Gentlemen. All right, bring the jury in."

The rule adopted in South Carolina in reference to the sequestration of witnesses is excellently stated in the case of *State v. O'Neal,* 210 S. C. 305, 312, 313, 42 S. E. (2d) 523, 526, as follows:

"The granting or refusing of a motion for separation or sequestration of witnesses is within the sound discretion of the trial judge. It is within the power of the trial court to exclude witnesses from the court room during the trial, and to direct that they shall be examined out of the hearing of one another, or shall be 'put under the rule,' as it is frequently termed. 23 C. J. S., Criminal Law, § 1010, p. 377.

"While an order excluding witnesses is as a matter of fact rarely withheld if it is applied for by either party in good faith, as a general rule the party is not entitled to an order of exclusion as a matter of right and the motion may be refused if the court in the exercise of a sound discretion does not deem that there are sufficient grounds therefor."

Not knowing any of the circumstances surrounding the case, the trial Judge cannot be said to have exercised the sound discretion contemplated by the governing law as above quoted for the simple reason that he had nothing before him on which to bottom his opinion, and exercise his discretion.

It would have been obvious to anyone acquainted with the facts of this case, as disclosed by the record herein, why the motion was made, and the sound reason why it should have been granted, especially where the defendant's life was at stake. The status of the prisoner-witnesses was such that they could ill afford to freely and voluntarily truthfully testify as to what they heard and observed at the time Captain Davenport so unfortunately met death and shortly before. These prisoners were bound to have hesitated in directly contradicting the guards' testimony when they had to continue the service of their sentences under these guards, and especially when the guard, Elmore, testified in effect that when he pulled out his pistol he didn't know whether he would have shot the defendant if the defendant had not hit him with a bottle and taken his pistol from him. Again, in two instances, while Elmore was testifying first, on direct examination, he stated that he had never taken the defendant on a job with him, and immediately following this testimony, stated that he had had occasion to correct the defendant when the defendant refused to work, and walked up to him and told him, "I don't aim to hit another lick." at which time this witness told the defendant he would kill him right then; and again on cross-examination when counsel asked him, "You all just put him (the cook) in charge of all of them," and he replied, "We didn't no such damn thing." Undoubtedly the trial Judge did not hear the witness' answer since he did not at least sternly reprove him.

We think it is clear that the trial Judge, under the circumstances hereinbefore related, committed an abuse of discretion, which means an error of law, in failing to grant appellant's motion for the segregation of the witnesses, he being charged with a crime for which, if convicted, the punishment was death. In this connection, see 53 Am. Jur., Trial, Sec. 31.

We find it unnecessary to make reference to the other exceptions.

Reversed and remanded for a new trial.

532

TAYLOR, J., concurs.

STUKES, OXNER, and LEGGE, J.J., concur in result.

OXNER, Justice (concurring).

While a few courts adopt the view that sequestration of witnesses is demandable as of right, in most jurisdictions the question is left to the discretion of the trial judge, subject to review and reversal upon a showing of abuse of discretion. See annotation 32 A. L. R. (2d), beginning on page 358. The majority rule is followed in South Carolina. *State v. O'Neal*, 210 S. C. 305, 42 S. E. (2d) 523; *State v. Ferguson*, 221 S. C. 300, 70 S. E. (2d) 355. A motion for sequestration should rarely be denied in capital and other serious criminal cases. *Huffman v. Commonwealth*, 185 Va. 524, 39 S. E. (2d) 291. Such motion, however, "should be specific and be supported by some reason." *Commonwealth v. Turner*, 371 Pa. 417, 88 A. (2d) 915, 921, 32 A. L. R. (2d) 346.

I agree that under the exceptional circumstances presented in the instant case, the refusal of appellant's motion was an abuse of discretion and constitutes reversible error. While counsel should have stated some reason for their motion or made some showing as to a need for sequestration of the witnesses, a failure to do so will not be permitted to prejudice an accused in a case involving the death penalty.

STUKES and LEGGE, JJ., concur.