# Staunton

### Clyde Raymond Near v. Commonwealth of Virginia.

September 2, 1960.

Record No. 5135.

Present, All the Justices.

The opinion states the case.

*Robert Randolph Jones,* for the plaintiff in error.

*John W. Knowles, Assistant Attorney General (A. S. Harrison, Jr., Attorney General,* on brief), for the Commonwealth.

SPRATLEY, J., delivered the opinion of the court.

On December 12, 1958, Clyde Raymond Near, sometimes hereinafter referred to as defendant, was indicted for the murder of Barry Steele Chapman. On January 6, 1959, the trial court, before accepting any plea of the accused, appointed Robert Randolph Jones, a competent attorney at law, to defend him.

Upon the recommendation of a physician, the trial court committed Near to the Southwestern State Hospital for observation and report as to his mental condition. On receipt of the report from the hospital that Near was mentally competent and capable of standing trial on the charges pending against him, he was ordered to be returned to the custody of the sheriff of Powhatan county to await trial.

On May 26, 1959, the defendant was arraigned and, after consultation with his attorney, pleaded not guilty in his own proper person. A panel of twenty qualified jurors taken from a list of names on a writ of *venire facias* issued by order of the court on April 27, 1959, was made up, the names on the writ having been drawn by the clerk of the court, in the presence of the judge of the court, from a ballot box, in the manner provided by law. Code, § 19-173.

Near moved to quash the trial *venire* on the grounds, that no women were named thereon, and that the statute authorizing the

service of women as jurors is unconstitutional, in that it places their service on a voluntary basis. The motion was overruled and the defendant excepted. A jury of twelve men was then selected and sworn to try the case. Code, § 19-182.

Near next moved the court to exclude all persons from the courtroom, who were expected to testify, until the time came for them to take the witness stand. The motion was granted. However, the court permitted the Sheriff of Powhatan County, F. W. Simpson and his Deputy Sheriff M. L. Jones to remain in the courtroom. Another witness, Stuart Gathright, remained, apparently unnoticed, in the courtroom until he was called to testify. Defendant objected to the giving of testimony by the above three persons. He was overruled and exceptions noted.

After hearing a portion of the evidence, the case was continued to the following day. Upon agreement between the Attorney for the Commonwealth and the attorney for the defendant, the jurors were told by the court that it would not be necessary for them to be kept together when the court was in recess or adjournment. Code 1950, § 19-188 (§ 19.1-213, 1960 Cum. Supp.) The jurors were instructed not to talk to anyone about the case other than themselves, not to allow any person to discuss it in their presence, and not to read any newspapers or look at television during the progress of the trial. This instruction was repeated several times thereafter.

Seventeen instructions were given to the jury, without exception. They set out fully the theories of both the Commonwealth and the defendant with respect to all issues involved. The jury returned a verdict of guilty of murder in the first degree and fixed the penalty at death.

The evidence is stipulated in narrative form, and there are few material conflicts. It will be stated somewhat in detail, in the light most favorable to the Commonwealth, the jury having settled the conflicts.

Barry Steele Chapman, a counselor employed by the Virginia Industrial School for Boys, was found dead in his apartment at the School about 1:00 p. m. on Monday, November 10, 1958, by Stacy Clements, also an employee of the School. Chapman, twenty-four years of age, weighed about one hundred and sixty pounds, and was five feet, ten inches in height. He was living alone, his wife having left him.

Deputy Sheriff Jones arrived at the scene shortly after 1:00 o'clock

p. m. the same day, followed by State Police Officer L. B. Marston, State Police Investigator J. C. Ogburn, Jr., and Sheriff Simpson. These officers found the body lying on the floor of the bathroom of the apartment, face up, with feet toward the bathroom door, blood stains on the floor and on the faucets of the washbasin and in the washbasin. A part of a shotgun, wrapped in a towel, was on the body. In the living room there was blood on the floor and on the wall near a sofa, and bits of hair on the wall.

Howard A. Brackney, an Indiana State Trooper, said that on the morning of November 18, 1958, upon being directed to investigate a parked automobile, he found the defendant asleep as he approached the car; that he informed him that he was under arrest; and upon asking him if he was the man for whom the Virginia authorities were looking, the defendant replied: "I am the guy, I did it." The witness testified that Chapman's billfold containing his driver's license and registration card for the automobile were found in the left rear pocket of the defendant. Defendant admitted that he was wearing Chapman's clothing.

Ogburn testified that he first saw the defendant in jail at Greencastle, Indiana; that when he asked the defendant when he killed Chapman, the defendant replied: "It was dark;" that defendant stated when he entered the room of Chapman's apartment, Chapman was lying on a couch; that he washed his hands and did not think he was seen; and that he said there was less than $100 in Chapman's billfold. The witness further said that when he returned to Indiana to bring the defendant back to Virginia, the defendant admitted, on the return trip, pawning several items of Chapman's property and identified the pawn tickets received therefor.

Marston testified that after defendant's arrest, he went to Indiana and saw the defendant; and that the latter admitted killing Chapman, taking the latter's automobile, money, watch and clothes. He said that defendant stated to him that there had been no argument between him and Chapman.

Sheriff Simpson testified that he accompanied J. C. Ogburn, Jr., State Police Investigator, to Indiana, for the purpose of returning the defendant to Virginia; that the defendant told him that he had killed Chapman and would explain it in court after he had talked to a lawyer; that he admitted taking the items mentioned belonging to Chapman, and pawning some of them, using Chapman's identification cards. He further said that defendant, in the presence of the Com-

monwealth Attorney of Henrico County, and the latter's assistant, immediately upon Near's return to Virginia, after being informed of his rights in the matter, stated in answer to questions asked by the sheriff, that there had been no argument between him and Chapman prior to the killing.

Mrs. G. B. Wimmer said the defendant was her uncle, and came to visit her and her husband in September, 1958. She said she last saw him at 5:30 p. m. on November 7, 1958, when she left her apartment to attend to some of the boys in the cottage in which she was the hostess or "mother." She said Near had stolen some of her husband's blank personalized checks and knew the paydays of the employees of the Industrial School. Her husband said that Chapman was in the habit of visiting the Wimmer apartment; that Near became acquainted with Chapman through him (Wimmer); that they played cards and listened to western music in Wimmer's apartment; and that the defendant went on automobile trips with Chapman, and often visited Chapman in his apartment. He further said that he last saw Chapman at 6:00 p. m. on November 7, 1958; that he had obtained two different jobs for Near, which the latter abandoned; that he and his wife told defendant that they were going to their former home and he would have to make other arrangements; that Near told him he was "going to hop a freight and go to Chicago;" and left his suitcase in the Wimmer apartment; and that the defendant knew the paydays of the employees of the Industrial School and also knew that Chapman's wife was in Pennsylvania.

Stuart Gathright, an accountant employed by the Industrial School, testified that he went to a bank with Chapman on November 3, 1958, when the latter cashed his salary check for $125; and that Chapman had not spent any of that money except about $12.

The defendant, testifying in his own behalf, said that he was thirty-four years of age, weighed approximately one hundred and forty-five pounds, was five feet, eight inches tall. His right hand had been maimed and part of the index finger on that hand had been amputated. He had served in the United States Army as a paratrooper and was with the invasion force that landed on the Normandy beachhead; he had been dishonorably discharged from the Army as a result of overstaying a leave of absence due to battle fatigue; he had been convicted of a felony since World War II; he was a truck driver by occupation; he had come to Virginia in September, 1958, and while visiting with the Wimmers he had been friendly with

Chapman, who frequently came to the Wimmers' apartment to play cards and to listen to western music. He said that he frequently visited Chapman in the latter's apartment, where they talked and listened to tape recorded music; that he had been rabbit hunting and on trips with Chapman, in Chapman's Cadillac, to various places; that Chapman was easily angered and he had seen him display bad temper toward others on several occasions. While visiting the Wimmers, he, Near, had worked at two different jobs and had a little money. He denied the statements attributed to him by Sheriff Simpson, as made in the Henrico County jail, especially the statement that there had been no argument between him and Chapman.

Near said that after supper on November 7, 1958, he visited Chapman, who was alone in his apartment; that the two of them listened to some recordings and discussed various subjects. Chapman was lying on the studio couch in the living room, while he, Near, was sitting in a rocker about half-way across the room; that their conversation led to Chapman's wife; that he told Chapman that he had a good wife and suggested that he get her to return; whereupon, Chapman became very angry and stated that his wife was about six months' pregnant and he did not believe the child was his because he had not "slept" with her for six months; that Chapman said to the defendant, "You could have been 'jobbing' her for all I know;" that he told Chapman he was "a damn liar;" and Chapman, in return, called him "a rotten bastard," and started to arise from the couch; that when Chapman started toward him with "his fists drawn back," he became "frightened and terrified;" that he got Chapman's gun, which was standing against the wall four or five feet away, and struck Chapman across the head with the gun, breaking the gun stock; that he struck several other blows, making "a gouge" in Chapman's throat with the broken end of the gun; that when he realized Chapman was unconscious, he dragged him to the bathroom with the intent of trying to revive him; that finding it was too late, he became panic stricken, and did not know what he should do other than to leave; that he washed his hands in the bathroom, closed the bathroom door, and returned to the living room, where he took off his clothes and put them in a closet, along with parts of the gun stock, and then put on Chapman's clothes; that he took Chapman's pocketbook with all its contents, including $52.00, his watch, radio, keys to the Cadillac, and other items. He then left the apartment, got into Chapman's car, drove to the R. J. Willis farm, where he picked up Thomas Howard

Spencer, and drove to a drive-in movie, where they saw and talked to two girls, went to an Esso service station at Cumberland Court House to get the speedometer fixed, and then returned Spencer to the Willis farm; that he went back to Cumberland, saw the girls again, drank a cup of coffee, and proceeded toward Indiana. He said that he "did not premeditately, deliberately, nor with malice afore-thought kill and murder" Chapman.

On cross-examination defendant testified that he killed Chapman because he called him "a rotten bastard." He also admitted that Chapman did "not completely get off the couch" before he hit him the first time.

Thomas Howard Spencer corroborated the statement of Near with respect to his association with him on the night of November 7, 1958. He said that he noticed a suitcase on the back seat of the Cadillac, and the defendant told him that he was going to southwest Virginia to take a job.

Upon return of the verdict, defendant moved to set it aside as contrary to the law and the evidence, and for other errors alleged to have been committed during the trial, and asked permission to later file formal objections and exceptions, which was granted.

On August 4, 1959, the above motion was heard, and the defendant offered the following evidence:

That the courtroom was crowded during the trial, with spectators filling all the seats, some standing alongside the walls, and others looking in through the windows. On the court house lawn some ladies had erected, in the shade of a tree near the building, several tables and benches for the sale of lunches. During a recess, members of the jury were observed in the crowd milling around the tree and around the lunch tables. On the second day, the attorney for the defendant saw a juror sitting on a bench talking with a spectator, and advised the court that "a juror was mingling with spectators under the shade of a tree;" whereupon, the trial judge directed the sheriff to keep the jury separated from the spectators.

At the hearing on the motion to set aside the verdict, six witnesses were called by the defendant, four of whom testified that while they talked with and observed others talking with jurors, on the court house lawn during the course of the trial, they neither saw nor heard anyone talking to any juror about the case. A newspaper reporter testified that immediately after the trial, he heard a part of a conversation between the father of the dead man and the foreman

of the jury, in which the father said to the foreman, "They never brought up that thing I told you about;" but that he, the reporter, knew of no prior conversation between the two. The sixth witness, another reporter, identified a picture which was taken of the crowd on the lawn, in which he could identify only the trial judge.

After this testimony was presented, the twelve jurors were called before the trial court, one at a time, and each questioned as to: (1) Whether he had understood the court's instruction not to discuss the case with anyone other than members of the jury; (2) Whether he had, at any time during the trial of the case, discussed it with anyone other than members of the jury; (3) Whether he overheard any conversation of the spectators in the court house yard about the case; (4) Whether his verdict was influenced by any statement or action of what he heard or saw outside the courtroom; and (5) Whether he reached his verdict strictly on the law and evidence presented. Each juror, in response to the first and fifth question answered in the affirmative and answered in the negative the second, third and fourth questions.

On cross-examination, ten of the jurors said they had been under the shade of the trees and around the tables where sandwiches and soft drinks were sold during recesses or intermissions on each day of the trial. The foreman of the jury, William E. Davis, testified that he had not talked to the father of the victim, or to anyone else, about the case until after the verdict was rendered. The twelfth juror, W. T. Johnson, Jr., said that he had not discussed the case with anyone other than members of the jury panel during recess of the court, and that he had not looked at television, nor read newspapers during the trial.

On August 4, 1959, the court overruled the motion to set aside the verdict and entered final judgment sentencing the defendant to death.

On October 12, 1959, sixty-nine days later, the defendant presented to the court three affidavits in which affiants declared that they had discussed the trial of the case with W. T. Johnson, Jr., one of the jurors, on May 26, 1959, and that he, Johnson, had watched a television news report of the trial in their company. The affiants were the wife, mother-in-law, and father-in-law of the juror. Two days later, October 14, 1959, defendant filed a motion in writing to set aside the judgment because of the alleged misconduct of juror Johnson. On October 16, 1959, an affidavit of the attorney for Near

was filed reciting the circumstances under which he obtained, on October 7, 1959, knowledge of the situation alleged in the above three affidavits.

A final motion for a new trial was filed with the clerk of the court on November 27, 1959, also based upon the affidavits from the family of juror Johnson. It will be remembered that juror Johnson had specifically denied the misconduct alleged against him when he was examined by the court on August 4, 1959.

No order was entered on either of the above two motions, apparently because each was made more than twenty-one days after final judgment had been entered. Rule of Court 1:9.

There are eight assignments of error by the defendant, which present the following questions:

(1) Whether the court erred in overruling the motion to quash the *venire facias* because no women were included on the panel summoned for the trial, and whether Code, §§ 8-174 and 8-182, authorizing women to serve as jurors and providing exemptions for women from jury service are unconstitutional; (2) Whether the court erred in permitting Sheriff Simpson, Deputy Sheriff Jones, and Stuart Gathright to testify; (3) Whether the court erred in refusing to set aside the verdict because of alleged misconduct of members of the jury; and (4) Whether the verdict of the jury is contrary to the law and the evidence.

The above questions will be considered in the order made.

■ Pursuant to § 8 of the Constitution of Virginia, the legislature enacted § 8-174, Code of Virginia, which provides that "All citizens over twenty-one years of age who shall have been residents of this State one year, and of the county, city or town in which they reside six months next preceding their being summoned to serve as such, and competent in other respects, except as hereinafter provided, shall remain and be liable to serve as jurors, * * *."

Section 8-178, Code Supplement 1958, lists those persons who are exempted from serving as jurors in civil and criminal cases. That section and § 8-182 further provide how women may avail themselves of the privilege of exemption. Here, the *venire facias* properly included only the names of those who were drawn and selected for jury service in accordance with the mode required by statute. Code, § 19-173. There is in the record no foundation for the suggestion of discrimination in the selection of the names, nor any proof of prejudice to the rights of the defendant. There is no hint of a pur-

poseful or systematic exclusion of women from the names drawn and selected.

All that the defendant was entitled to was a speedy trial by an impartial jury of his vicinage. Section 8, Constitution of Virginia. He had no constitutional right to friends on the jury, or to a proportional representation of sex thereon. Jurors should be selected on the basis of individual qualifications and not on the basis of sex or race. The burden of proving a purposeful and intentional discrimination was on the defendant and this he had wholly failed to show. *Bailey* v. *Commonwealth*, 191 Va. 510, 520, 521, 62 S. E. 2d 28.

■ There is no merit in the contention that the statute authorizing women to serve as jurors is unconstitutional, because it places such service by women on a voluntary basis.

Code, § 8-182 provides that the jury commissioners shall advise, in writing, each woman whose name has been selected to be placed upon the jury list of that fact, and shall notify her that her name will be placed upon such list, unless she gives notice in writing within fifteen days of the date of the notice to her that she does not desire her name to be placed upon such list. If the selected woman does not notify the commissioners within the required period of her desire not to be placed on the list, her name is included on such list and she must serve when summoned for duty, unless excused by the court. The privilege given to women is a statutory declaration of public policy to enable them to avoid court trials, which often involve facts and circumstances of a filthy, indecent, and loathsome nature, references to intimate sexual relations, and other elements likely to prove humiliating and embarrassing to a lady.

There is no Virginia statute authorizing women to volunteer for jury service. Code, § 8-182 gives to women whose names have been selected to be placed upon the jury list the right to obtain exemption from jury service by giving due notice of her desire that her name be omitted from the jury list.

*Cf. Bailey* v. *State*, 215 Ark. 53, 219 S. W. 2d 424, 9 A. L. R. 2d 653, and Annotation 9 A. L. R. 2d 661; *Martin* v. *United States*, 166 F. 2d 76; *Fay* v. *New York*, 332 U. S. 261, 91 L. ed. 2043, 67 S. Ct. 1613; 31 Am. Jur., Jury, § 101, pp. 90, 91.

■ Did the trial court err in allowing Sheriff Simpson, Deputy Sheriff Jones, and Gathright to testify?

Section 19-219 of the Code reads as follows:

"In the trial of all criminal cases, whether the same be felony or

misdemeanor cases, the court may, in its discretion, exclude from the trial any or all persons whose presence is not deemed necessary."

The sheriff is a public officer and it is a part of his duty to wait upon the court, and have charge and custody of the jury during a trial, if so ordered by the court. Code 1950, § 19-188 (§ 19.1-213, 1960 Cum. Supp.) He and his deputies are furthermore required to keep order in the courtroom while the trial is in progress.

The ruling of the court as to the separation and exclusion of witnesses is in the sound discretion of the court, and will be undisturbed unless the record discloses an abuse of the discretion. *Burford* v. *Commonwealth*, 179 Va. 752, 20 S. E. 2d 509; *Huffman* v. *Commonwealth*, 185 Va. 524, 531, 39 S. E. 2d 291; *Hampton* v. *Commonwealth*, 190 Va. 531, 58 S. E. 2d 288; *Huddleston* v. *Commonwealth*, 191 Va. 400, 61 S. E. 2d 276; *Campbell* v. *Commonwealth*, 194 Va. 825, 75 S. E. 2d 468; 53 Am. Jur., Trial, § 31; 23 C. J. S., Criminal Law, § 1364, p. 1024 *et seq.*; 11 M. J., Jury, § 55, pages 534 *et seq.*

In *Huffman* v. *Commonwealth, supra,* Justice Eggleston, now Chief Justice Eggleston, collected and reviewed the authorities bearing upon the exclusion of witnesses from the courtroom during a trial. There we said that the separation of witnesses in the trial of a case is not grantable as a matter of right. It is a matter which lies within the sound discretion of the court, subject to review and reversal upon a showing of abuse of discretion or prejudice resulting therefrom. (185 Va. page 531) The particular facts in each case must be considered in determining whether the court abused its authority in that case.

The defendant relies upon *Plymale* v. *Commonwealth*, 195 Va. 582, 79 S. E. 2d 610, where we said that if it is known that a sheriff is to testify, the better practice is to exclude him from the courtroom, a statement which we here repeat. In that case, the sheriff was the key witness for the Commonwealth. Without his testimony, the jury might have reached a different verdict. In the current case, it can be readily seen that the case of the Commonwealth was complete without the evidence of either the sheriff or his deputy. The deputy did not testify as to any material fact, or identify any property about which other witnesses did not testify. Sheriff Simpson's testimony was cumulative and in more detail. All the details had been or were later supplied by Clements, Marston and Ogburn. The evidence of Indiana Trooper Brackney and Near himself put Near's con-

fession of guilt before the jury. No objection appears to have been made to the sheriff's statement of the admission made to him by Near in the Henrico County jail.

Gathright's evidence was harmless. It showed that Chapman had cashed his check on November 3, 1958, and spent only a small portion of the money received. The amount of money taken was not material to the issue, in view of Near's admission that he took Chapman's wallet and money.

The principal conflict in the evidence lies in Near's statement that he killed Chapman because he was provoked by the language used by the latter and feared also that he would be assaulted.

When we consider the third question, it must be remembered that the jury had been permitted to separate by the court upon the consent of the accused and the Commonwealth. In such a case, "prejudice will not be presumed in favor of the accused, and the burden will be upon him to show that the jury, during such separation, were guilty of misconduct to his prejudice." · *Powell* v. *Commonwealth*, 182 Va. 327, 338, 28 S. E. 2d 687.

Cf. *Lilley* v. *Simmons*, 200 Va. 791, 798, 108 S. E. 2d 245.

The trial court, on August 4, 1959, promptly investigated and considered the charges and testimony in support of the motion to set aside the verdict, because of alleged misconduct of the jurors. That investigation disclosed no evidence of misconduct, but only conjecture and speculation on the part of the defendant and his counsel.

The able and learned trial judge had the opportunity to pass upon the credibility and weight of the statement of the witnesses with respect to the alleged misconduct and the sworn statement of each juror that he had faithfully observed the directions of the court. There was nothing tending to show that the verdict of the jury was affected by anything the jurors heard, saw, or did outside the courtroom; nor was there evidence that anyone tried to influence a juror, or to prejudice him against the defendant.

The affidavits presented subsequent to August 4 do not show what was said by any party to the alleged discussions of the case out of court, or by the television news commentator, or that the juror, Johnson, was in any way influenced by the alleged discussion of the case with his family, or by the television broadcast. Moreover, the affidavits were presented more than twenty-one days after final judgment. Rule of Court 1:9.

It is settled that a motion for a new trial on the ground of misconduct of a juror is addressed to the sound discretion of the trial judge, and unless he abuses that discretion, his judgment concludes the matter on appeal. *Kearns* v. *Hall*, 197 Va. 736, 740, 91 S. E. 2d 648.

The final question is whether the verdict was contrary to the law and the evidence. The defendant admits the slaying of Chapman; but seeks to justify it on the ground of provocation or self-defense, and lack of proof that the killing was wilful, deliberate and premeditated. Defendant's statements to the officer in Greencastle, Indiana, when he was placed under arrest, and asked whether he was the guilty person sought for the killing of Chapman was: "I am the guy, I did it." When asked when he killed Chapman, he replied: "It was dark," and Chapman was lying on the couch. He did not reply when asked how many times he struck the victim. He made no statement whatever indicating justification for the attack, or that he acted in self-defense.

The evidence shows that Near took Chapman's shotgun, broke it over Chapman's head, struck an uncounted number of other blows with a broken part of the gun, and in doing so made "a gouge" in Chapman's throat. It shows a brutal and vicious slaying; the robbery of the body of the dead man; the rifling of his apartment; the theft of his automobile; and the immediate departure of the slayer from the scene. His conduct thereafter shows no sign of remorse or regret. All of the elements and circumstances point to a wilful, deliberate and premeditated homicide, and not a sudden killing in the heat of passion, engendered by adequate provocation. The relative weight and size of the men, and the nature of the attack alleged by Near to have been made upon him by Chapman provide no justification for the violence of the assault made by Near upon Chapman.

The evidence of the Commonwealth included every element necessary to raise the crime of murder to the first degree. The jury accepted this evidence, and we must, therefore, affirm the judgment. Code, § 8-491.

*Affirmed.*